J-S60015-19

2020 PA Super 65

COMMONWEALTH OF PENNSYLVANIA    :    IN THE SUPERIOR COURT OF
                                :          PENNSYLVANIA
                                :
            v.                  :
                                :
                                :
                                :
DAMEON LYDELL BUMBARGER         :
                                :
        Appellant               :    No. 878 MDA 2019

Appeal from the Judgment of Sentence Entered May 20, 2019
In the Court of Common Pleas of Centre County Criminal Division at
No(s): CP-14-CR-0000586-2018

BEFORE:   SHOGAN, J., STABILE, J., and PELLEGRINI, J.[*]

OPINION BY SHOGAN, J.:                         **FILED MARCH 16, 2020**

Appellant, Dameon Lydell Bumbarger, appeals from the judgment of
sentence entered on May 20, 2019, in the Court of Common Pleas of Centre
County.  We affirm.

This appeal stems from a case involving a motor vehicle stop on April 1,
2018.  As a result of that stop, Appellant was arrested and charged with
multiple drug and firearm violations.  Prior to trial, Appellant filed a motion to
suppress evidence.  A hearing on the motion was held on August 24, 2018,
following which the trial court denied Appellant's motion and made the
following findings of fact:

    1. Trooper [Shane] Murarik was traveling eastbound on Route 322
    while on patrol duties on April 1, 2018 around approximately

_____

[*] Retired Senior Judge assigned to the Superior Court.

9:30 p.m. when he observed a White Chevy Impala driving westbound on 322.

2. Trooper Murarik has previous experience with [Appellant] and [Appellant] was known to drive a White Chevy Impala. Trooper Murarik believed there was an outstanding warrant for [Appellant's] arrest. Trooper Murarik knew [Appellant] was a suspected drug user.

3. Trooper Murarik looked up [Appellant] in his mobile computer system which returned a warrant out of Colorado saying "full extradition."

4. Trooper Murarik turned his vehicle around, and followed the White Chevy Impala onto East Presqueisle Street in Philipsburg Borough. Trooper Murarik ran the vehicle registration, which came back identifying [Appellant] as the owner.

5. Trooper Murarik followed the vehicle and observed a white male with short hair approximately matching [Appellant's] description driving the vehicle. Trooper Murarik then stopped the vehicle, and approached it.

6. Trooper Murarik identified the driver as [Appellant], asked him to step out of the vehicle, and took him into custody. Backup troopers arrived, so Trooper Murarik had Trooper Ramstine put [Appellant] in the back of his vehicle.

7. Trooper Murarik approached the passenger side of the vehicle to speak with the passenger. The passenger identified herself as Roberta Sheaffer (Sheaffer).

8. Trooper Murarik was previously aware of Sheaffer from a prior stop, and was aware she was known to be involved with drugs. Sheaffer appeared zoned out to Trooper Murarik and appeared to be under the influence of drugs.

9. Based on Trooper Murarik's observations and his belief that she was under the influence of drugs, Trooper Murarik asked Sheaffer to step out of the vehicle to question her.

10. While Sheaffer was exiting the vehicle Trooper Murarik observed two syringes partway under the passenger seat of the

vehicle. Trooper Murarik has previous experience with this type of syringe and knows they are used to inject drugs.

11. The syringes were not in a case or secured in any manner.

12. Trooper Murarik then conducted a probable cause search of the vehicle and found numerous drugs and a Colt 45 revolver in a box on the rear seat.

13. Trooper Murarik mentioned the Colt 45 revolver to [Appellant] who in turn discussed a 9 millimeter pistol, which Trooper Murarik found under the driver's seat. Both firearms were within reach of the driver's seat where [Appellant] had been sitting prior to the stop.

14. The 9 millimeter pistol was loaded and had an additional loaded magazine with it. There were fifty-one (51) bags of methamphetamines and marijuana in the vehicle.

15. Trooper Murarik spoke with Sheaffer about the firearms. She stated they belonged to [Appellant], and she knew about the firearms because [Appellant] told a third party about the firearms.

16. [Appellant] has previously been convicted of burglary and is not permitted to carry firearms in the Commonwealth.

Trial Court Opinion, 9/28/18, at 1-3.

On May 20, 2019, following a stipulated-fact nonjury trial, the trial court found Appellant guilty of one count each of possession with intent to deliver ("PWID"), 35 P.S. § 780-113(a)(30), and Persons Not to Possess a Firearm, 18 P.S. § 6105(a)(1). Appellant was sentenced to a term of imprisonment of two to four years in a State Correctional Institution, with credit for 415 days served in the Centre County Correctional Facility. Order, 5/21/19, at 1. Appellant filed an appeal on May 29, 2019. Appellant and the trial court complied with Pa.R.A.P. 1925.

On appeal, Appellant presents the following issues for our review:

A. Did the Trial Court err in denying Appellant's Motion to Suppress, which argued that there was no basis for the stop of [Appellant] as the only reason given for the stop, an alleged arrest warrant from Colorado, was not a valid extradition warrant and was not to be executed outside Colorado?

B. Did the Trial Court err in denying Appellant's Motion to Suppress, which argued that there was no basis for the stop of [Appellant] as the Trooper who stopped [Appellant] was not able to determine if it was [Appellant] in the vehicle and instead merely assumed he was in the vehicle and merely assumed that the warrant was valid?

C. Did the Trial Court err in denying Appellant's Motion to Suppress, which argued that the continued detention of [Appellant's] passenger was unlawful as it lacked a renewed showing of reasonable suspicion and it was only after the Trooper had the passenger step out of the vehicle that he alleged he had probable cause to then search the vehicle?

D. Did the Trial Court err in denying Appellant's Motion to Suppress, which argued that the two syringes the Trooper claimed he observed when he had the passenger step out of the vehicle did not possess an incriminating character that was immediately apparent, and thus, would not have justified a probable cause search of the vehicle?

E. Did the Trial Court err in denying Appellant's Motion to Suppress, which argued that the items the Trooper alleged he saw and that the Trooper then relied on to justify the search of the vehicle - namely, the two syringes - could not possibly have been immediately apparent from a proper vantage point as required under the plain view exception, and thus, no vehicle search should have ensued?

Appellant's Brief at 7-8.

With respect to an appeal from the denial of a motion to suppress, our

Supreme Court has stated the following:

Our standard of review in addressing a challenge to a trial court's denial of a suppression motion is whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. When reviewing the ruling of a suppression court, we must consider only the evidence of the prosecution and so much of the evidence of the defense as remains uncontradicted when read in the context of the record. . . . Where the record supports the findings of the suppression court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error.

*Commonwealth v. Eichinger*, 915 A.2d 1122, 1134 (Pa. 2007) (citations omitted). "It is within the suppression court's sole province as factfinder to pass on the credibility of witnesses and the weight to be given their testimony." *Commonwealth v. Gallagher*, 896 A.2d 583, 585 (Pa. Super. 2006). Moreover, our scope of review from a suppression ruling is limited to the evidentiary record that was created at the suppression hearing. *In re L.J.*, 79 A.3d 1073, 1087 (Pa. 2013).

In his first issue, Appellant argues that because the warrant was not a valid, proper extradition warrant, there was no justification for Trooper Murarik to stop Appellant. Appellant's Brief at 21. Appellant states that the warrant "was never intended to be an out-of-state warrant requiring extradition, but instead, was only to be an active arrest warrant to be executed within the State of Colorado." *Id.* at 23-24. Thus, Appellant maintains that because the extradition warrant was the sole basis for the stop, and it was invalid, Trooper Murarik lacked authority to stop Appellant. *Id.* at 22-24.

The evidence presented at the suppression hearing established that on the date in question Trooper Murarik observed a white Chevy drive past him.

N.T., Suppression Hearing, 8/24/18, at 5. Trooper Murarik testified that he and other officers were on the lookout for a white Chevy Impala "due to us becoming aware of [Appellant] driving it and him having active arrest warrants."[1]  *Id.*  Upon observing Appellant, Trooper Murarik turned his car around in order to follow Appellant.  *Id.*  While Trooper Murarik was following behind Appellant's vehicle, he ran Appellant's registration number through National Crime Information Center ("N.C.I.C.").  *Id.*  N.C.I.C. indicated that the plate was registered under Appellant's name and to a white Chevy Impala.  *Id.* at 5-6.  N.C.I.C. also indicated that there was an active arrest warrant for Appellant, indicating that it was a Colorado warrant "with full extradition."  *Id.* at 9, 24.

Trooper Murarik testified that upon approaching the white Chevy Impala, he was able to discern that a male with short hair was driving the vehicle.  N.T., 8/24/18, at 7.  Trooper Murarik stopped the white Chevy Impala, and upon approaching the vehicle, confirmed that Appellant was the driver.  *Id.* at 12.

Thus, there was no dispute that on April 1, 2018, N.C.I.C. alerted Trooper Murarik to an outstanding, active arrest warrant for Appellant. Because of his prior involvement with Appellant, Trooper Murarik was familiar

---

[1]  During an incident in mid-March, prior to the current incident, Trooper Murarik had seen Appellant driving the white Chevy Impala and subsequently learned of the outstanding warrant.  *Id.*

with Appellant and his vehicle. The driver of the vehicle resembled Appellant. The registration reflected that the white Chevy Impala was registered to Appellant. Thus, Trooper Murarik had probable cause to stop Appellant's vehicle and arrest Appellant. As this Court has explained:

> We have previously held that the information contained in a[n] N.C.I.C. report is so inherently reliable that such information is, in and of itself, sufficient to form the basis of a finding of probable cause for a police officer who receives such information from an N.C.I.C. report to make an on the spot arrest.

*Commonwealth v. Cotton*, 740 A.2d 258, 264-265 (Pa. Super. 1999) (citing *Commonwealth v. Feflie*, 581 A.2d 636, 642 (Pa. Super. 1990)); *see also Commonwealth v. Bolton*, 831 A.2d 734, 736 (Pa. Super. 2003) ("This Court has consistently found that a report from the [N.C.I.C.] is sufficient to form reasonable and articulable grounds, *i.e.*, probable cause, that a crime is being committed or has been committed.") Thus, Trooper Murarik's stop and subsequent arrest of Appellant on April 1, 2018, was lawful. Appellant is entitled to no relief on his first claim.

In his related second issue, Appellant argues that "Trooper Murarik lacked the requisite level of suspicion for stopping [Appellant] as, at the time he initiated the stop, he could not confirm who the driver was and only assumed it was [Appellant] and only assumed the warrant was valid." Appellant's Brief at 29 (emphasis omitted). Appellant avers that on the night in question, Trooper Murarik could not definitively identify Appellant and therefore lacked the required basis to pull over Appellant's vehicle. *Id.*

Appellant again challenges Trooper Murarik's "assumption" that the arrest warrant reflected in N.C.I.C. was valid. *Id.*

As previously explained, at the suppression hearing, Trooper Murarik testified that prior to April 1, 2018, he was familiar with Appellant, his physical appearance, and the fact that Appellant drove a white Chevy Impala. N.T., 8/24/18, at 5-6, 26. On April 1, 2018, Trooper Murarik and other officers were advised to be on the lookout for a white Chevy Impala due to their knowledge that Appellant was driving it and had active warrants for his arrest. *Id.* at 5. As a result, when Trooper Murarik saw the white Chevy Impala, he began following the car and, after entering the vehicle's plate information into N.C.I.C., was notified that the plate was registered to a white Chevy Impala, Appellant was the registered owner of the Impala, and there was an active warrant for his arrest. *Id.* As a result, Appellant followed the vehicle and attempted to observe the driver. *Id.* at 6.

Trooper Murarik testified that with the aid of his vehicle headlamps and several streetlights in the borough, he was able to determine that a male with short hair was driving the vehicle. *Id.* at 6-7. Upon cross-examination, Trooper Murarik further explained that when he saw the vehicle and driver, he identified the driver as Appellant because: "it appeared to be him. It looked like him. He was driving. That's why I actually ran him, because I realized it was him." *Id.* at 26. After pulling the vehicle over, Trooper Murarik approached the vehicle and was able to confirm that Appellant was the driver

of the vehicle.  ***Id.*** at 12.  As a result, Trooper Murarik arrested Appellant. ***Id.***

As stated previously, the notification by N.C.I.C. that Appellant had an outstanding active arrest warrant provided Trooper Murarik with probable cause to stop Appellant.  ***Cotton***, 740 A.2d at 264-265.  Thus, any argument that Trooper Murarik erred by "assuming" that the warrant was valid and therefore, lacked authority to stop Appellant, is meritless.

Furthermore, we disagree with Appellant's assertion that Trooper Murarik had no basis to believe that Appellant was the driver of the white Chevy Impala on April 1, 2018.  As explained, prior to the date of the incident, Trooper Murarik was familiar with Appellant and his vehicle.  Further, on April 1, 2018, when Trooper Murarik observed the white Chevy Impala, the driver of the vehicle matched Appellant's description, and the driver was operating the vehicle registered to Appellant.  Finally, Trooper Murarik was able to confirm Appellant was driving the vehicle prior to his arrest.  Thus, we cannot agree that Trooper Murarik lacked the requisite level of suspicion that Appellant was the driver of the vehicle on April 1, 2018.  Appellant is entitled to no relief on this claim.

In his third issue, Appellant asserts that because the reason for the stop had already terminated when Trooper Murarik asked the passenger to exit the vehicle, such continued detention of the passenger was improper.  Appellant's Brief at 38.  Specifically, Appellant asserts that following the arrest of

Appellant and his removal from the vehicle, the purpose of the stop was terminated. **Id.** Thus, he maintains the continued detention of the passenger and direction to have her exit the vehicle was unlawful. **Id.** at 38-43. Accordingly, Appellant posits that the syringes and any evidence resulting from the search of the vehicle must be suppressed. **Id.** at 43.

A forcible stop of a motor vehicle by a police officer constitutes a seizure of a driver and the occupants. **Commonwealth v. Campbell**, 862 A.2d 659, 663 (Pa. Super. 2004). This Court has explained "that police may request both drivers and their passengers to alight from a lawfully stopped car without reasonable suspicion that criminal activity is afoot." **Commonwealth v. Brown**, 654 A.2d 1096, 1102 (Pa. Super. 1995) (quoting **Pennsylvania v. Mimms**, 434 U.S. 106 (1977)). Furthermore, police can require both the driver and the passengers in a lawfully stopped vehicle to identify themselves regardless of whether there is reasonable suspicion that the passengers are engaged in criminal activity. **Campbell**, 862 A.2d at 664-665.

In the case *sub judice*, the vehicle was lawfully stopped. As a result, Trooper Murarik was authorized to request the passenger to exit the vehicle and to ask the passenger for identification. **Brown**, 654 A.2d at 1102; **Campbell**, 862 A.2d at 664-665. As Trooper Murarik approached the passenger as part of the lawful stop, he identified her as Sheaffer. N.T., 8/24/18, at 16-17. Trooper Murarik testified that he had prior knowledge of Sheaffer and her activities involving illegal drug sales and use. **Id.** at 17, 37-

38. Trooper Murarik observed that Sheaffer had "a thousand yard stare, kind of a zoned out look on her." *Id.* at 17. As he asked Sheaffer to step out of the car and opened the door, Trooper Murarik saw "two syringes in plain view under the side of the seat." *Id.* at 18. Based on his training and experience, Trooper Murarik testified that he identified these syringes as "drug paraphernalia for injecting drugs, narcotics." *Id.* 18-19. Trooper Murarik explained that he did not have to move the seats or any items, nor bend down in order to see the syringes in plain view in the vehicle. *Id.* at 21. Trooper Murarik further testified that after pointing out the syringes to Sheaffer, she did not make any statement regarding their use for medical purposes. *Id.* at 20. As a result, Trooper Murarik conducted a probable-cause search of the vehicle. *Id.* at 30.

Police may search an automobile without a warrant as long as they have probable cause to do so because an automobile search "does not require any exigency beyond the inherent mobility of a motor vehicle." *Commonwealth v. Green*, 168 A.3d 180, 186 (Pa. Super. 2017). With respect to probable cause to search:

> [p]robable cause exists where the facts and circumstances within the officers' knowledge are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed. With respect to probable cause, this [C]ourt adopted a "totality of the circumstances" analysis in *Commonwealth v. Gray*, 509 Pa. 476, 503 A.2d 921, 926 (1985) (relying on *Illinois v. Gates*, 462 U.S. 213 [103 S.Ct. 2317, 76 L.Ed.2d 527] (1983)). The totality of the circumstances test dictates that we consider all relevant facts, when deciding whether [the officer had] probable cause.

- 11 -

***Id.*** at 186-187 (quoting ***Commonwealth v. Luv***, 735 A.2d 87, 90 (Pa. 1999)).

Here, Trooper Murarik approached the passenger of the vehicle as part of the lawful stop. Trooper Murarik knew Sheaffer, and knew of her drug use and sales history. Sheaffer's appearance reflected that she was under the influence of drugs. Moreover, when Trooper Murarik lawfully asked Sheaffer to exit the vehicle in accordance with the lawful stop, he observed drug paraphernalia in plain view.[2] Accordingly, we conclude that Trooper Murarik did not unlawfully detain Sheaffer or ask her to exit the vehicle. Furthermore, given his observation of Sheaffer's appearance, his knowledge of Sheaffer's drug-use history, and the observation of the syringes, Trooper Murarik had reason to suspect criminal activity. ***Green***, 168 A.3d at 186-187. Thus, Trooper Murarik had probable cause to search the vehicle. ***Id.*** at 186.

Next, Appellant argues that the two syringes found in the vehicle by Trooper Murarik did not possess an incriminating character that was immediately apparent, as they could have been used for legitimate purposes. Appellant's Brief at 44. Accordingly, Appellant asserts that their discovery did not justify a probable cause search of the vehicle. ***Id.***

The Controlled Substances Act defines drug paraphernalia as follows:

---

[2] The plain view doctrine provides that evidence in plain view of the police can be seized without a warrant. ***Commonwealth v. Anderson***, 40 A.3d 1245, 1248 (Pa. Super. 2012).

"**Drug paraphernalia**" means all equipment, products and materials of any kind which are used, intended for use or designed for use in . . . injecting, ingesting, inhaling or otherwise introducing into the human body a controlled substance in violation of this act. It includes, but is not limited to: . . .

* * *

(11) Hypodermic syringes, needles and other objects used, intended for use, or designed for use in parenterally injected controlled substances into the human body.

35 P.S. § 780-102(b)(11).

In determining whether an object is drug paraphernalia, a court or other authority should consider, in addition to all other logically relevant factors, statements by an owner or by anyone in control of the object concerning its use ... the proximity of the object, in time and space, to a direct violation of this act, the proximity of the object to controlled substances, the existence of any residue of controlled substances on the object, direct or circumstantial evidence of the intent of an owner, or of anyone in control of the object[.]

35 P.S. § 780-102; *see also Commonwealth v. Coleman*, 984 A.2d 998, 1001 (Pa. Super. 2009) (a determination that items possessed by a defendant were used or intended to be used with a controlled substance so as to constitute drug paraphernalia may be established through circumstantial evidence.).

As outlined above, hypodermic syringes are specifically included in the definition of "drug paraphernalia." 35 P.S. § 780-102(b)(11). Moreover, the circumstantial evidence in this case regarding the syringes supports the conclusion that they were drug paraphernalia. Trooper Murarik testified that based on his knowledge and experience, the appearance of these syringes was

consistent with those used as drug paraphernalia. N.T., 8/24/18, at 18-19. Furthermore, the location and unsecured nature of the syringes on the floor of the vehicle were not consistent with use of the syringes for medical purposes. *Id.* at 20. Moreover, Sheaffer appeared to be under the influence of drugs, and the syringes were in close proximity to her person in the vehicle. *Id.* at 17-19. Upon having her attention directed to the syringes, Sheaffer did not indicate that the syringes were for medical use. *Id.* at 20. Also, Sheaffer was known by Trooper Murarik to use and sell drugs. *Id.* at 17. Given the totality of circumstances, it was reasonable for Trooper Murarik to believe that these syringes were being used for a criminal purpose. Thus, discovery of these syringes in connection with the other relevant factors suggesting illegal drug use constituted probable cause to search the vehicle. Appellant's claim fails.

In his final issue, Appellant argues that Trooper Murarik was not able to view the syringes in the vehicle from a "lawful vantage point," and therefore, the plain view doctrine does not apply. Appellant's Brief at 55. Thus, Appellant maintains that the syringes could not have been relied upon to establish probable cause to search the vehicle. *Id.* at 55. Accordingly, Appellant posits that the syringes and the results of the search must be suppressed. *Id.*

Generally, a warrant stating probable cause is required before a police officer may search for or seize evidence. ***Commonwealth v. Anderson***, 40 A.3d 1245, 1248 (Pa. Super. 2012). However:

> the plain view doctrine provides that evidence in plain view of the police can be seized without a warrant, ***Coolidge v. New Hampshire***, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), as modified by ***Horton v. California***, 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990), and it was adopted by our Supreme Court in ***Commonwealth v. McCullum***, 529 Pa. 117, 602 A.2d 313 (1992). The plain view doctrine applies if 1) police did not violate the Fourth Amendment during the course of their arrival at the location where they viewed the item in question; 2) the item was not obscured and could be seen plainly from that location; 3) the incriminating nature of the item was readily apparent; and 4) police had the lawful right to access the item.

***Id.***

"Courts have alternatively described the plain view doctrine in terms of a three-prong test": The plain-view doctrine permits "the warrantless seizure of an object when: (1) an officer views the object from a lawful vantage point; (2) it is immediately apparent to him that the object is incriminating; and (3) the officer has a lawful right of access to the object." ***Commonwealth v. Luczki***, 212 A.3d 530, 547 (Pa. Super. 2019). "There can be no reasonable expectation of privacy in an object that is in plain view. To judge whether the incriminating nature of an object was immediately apparent to the police officer, reviewing courts must consider the totality of the circumstances." ***Id.*** "In viewing the totality of the circumstances, the officer's training and experience should be considered." ***Id.***

- 15 -

With regard to the first prong, we conclude that Trooper Murarik viewed the syringes from a lawful vantage point. As discussed, he had lawfully requested that Sheaffer exit the vehicle. As she exited the vehicle, the trooper saw in plain sight the syringes located on the floor of the vehicle. Moreover, Trooper Murarik testified that he did not have to move any items or bend down in order to see the syringes in plain view in the vehicle. N.T., 8/24/18, at 21. Thus, we disagree with Appellant's assertion that Trooper Murarik was unable to view the syringes in the vehicle from a lawful vantage point.[3] Accordingly, we conclude the record supports the trial court's decision to deny Appellant's suppression motion.

Judgment of sentence affirmed.

_____

[3] Although Appellant does not challenge the remaining two prongs of the plain-view-doctrine test, we note that they were also met. Given the totality of circumstances, including Trooper Murarik's training and experience, it was immediately apparent to the trooper that the syringes were incriminating in nature. *Luczki*, 212 A.3d at 547. Additionally, once the syringes were recognized as drug paraphernalia, Trooper Murarik had probable cause to conduct a search and then lawfully seize the syringes. *Id.*

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/16/2020