J-S38010-22

2023 PA Super 114

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| SHAHEED TARIQ GINDRAW | : | |
| | : | |
| Appellant | : | No. 1222 EDA 2022 |

Appeal from the Judgment of Sentence Entered April 18, 2022
In the Court of Common Pleas of Bucks County
Criminal Division at No(s): CP-09-CR-0001141-2020

BEFORE: KUNSELMAN, J., MURRAY, J., and SULLIVAN, J.

OPINION BY SULLIVAN, J.:                    **FILED JUNE 23, 2023**

Shaheed Tariq Gindraw ("Gindraw") appeals from the judgment of sentence imposed following his non-jury conviction for driving under the influence of alcohol.[1] Gindraw challenges the denial of his motion to suppress. We affirm.

The suppression court summarized the factual history relevant to this appeal as follows:

> On November 27, 2019, at approximately 12:22 a.m., Pennsylvania State Trooper Richard Sentak[2] ("Trooper Sentak") was on patrol, traveling south on State Route 413 . . . in Bucks County . . .. State Route 413 is a two-lane roadway, with one lane of traffic traveling in each direction. Trooper Sentak was working the midnight shift . . . along with his assigned partner, Trooper Steven Gentile ("Trooper Gentile") [who was driving the patrol vehicle]. . .
>
> > [2][Trooper Sentak] has been assigned to the patrol unit for the entirety of his seven years as a state trooper.

---

[1] *See* 75 Pa.C.S.A. § 3802(a)(1).

While completing training at the police academy, Trooper Sentak received instruction on standardized field sobriety tests and advanced roadside impairment detection. Trooper Sentak estimated that he has made over 150 DUI arrests and has been a part of another 150 to 200 DUI investigations during his tenure as a State Trooper. [*See* N.T. 11/29/21, at 8-9.]

At approximately 12:22 a.m., Trooper Sentak and Trooper Gentile (collectively the "Troopers") observed a vehicle on the shoulder of Route 413 with its hazard lights activated. There were very few streetlights on the road and the areas in which they were traveling was dark. The engine of the vehicle was running, while it was legally parked on the shoulder of the roadway.

Shortly after observing the above-mentioned vehicle, Trooper Sentak activated the patrol vehicle's emergency lights. Trooper Sentak activated his lights when approaching the vehicle for the purposes of providing greater visibility to both the Troopers and the vehicle they were pulling behind, along with greater protection for the Troopers and the occupant of the stopped vehicle. The patrol vehicle's lights also signal to other vehicles in the surrounding area to either slow down or move over. This in turn creates a safer environment for both law enforcement and the individual while on the side of a road. Based on Trooper Sentak's training and experience, he knew that when a vehicle is disabled, it is common for the vehicle's operator to use the vehicle's hazard lights to be more visible to other motorists traveling on the roadway.

After Trooper Gentile pulled the patrol vehicle behind the vehicle which had its hazard lights activated, Trooper Sentak exited the patrol vehicle and approached the driver's side to make contact with the operator of the vehicle, later identified as [Gindraw]. Trooper Sentak's flashlight was out and on as he approached the operator.

Moments later, Trooper Gentile approached the passenger's side of the vehicle, with his flashlight out and on as well. Trooper Sentak spoke to [Gindraw] for "a minute or two" to see if everything was "all right" with his vehicle. Trooper Sentak also engaged in other generic questioning to determine whether [Gindraw] was in need of any assistance. [Gindraw] stated that

he had "just dropped his friend off and he pulled over to put [] his home address into his cell phone."

> In speaking to [Gindraw], Trooper Sentak observed that [Gindraw's] eyes were glassy and bloodshot. [Trooper Sentak] also noted a "very strong odor of alcohol emanating from the vehicle." Once [Gindraw] emerged from his vehicle, the Trooper also noticed the odor of alcohol emanating from [Gindraw's] person. Based on Trooper Sentak's training and experience, such circumstances are "generally an indication that someone's been possibly drinking that night," and can indicate that someone may be under the influence of alcohol. In response to the Trooper's question if [Gindraw] had been drinking, [Gindraw] stated: "yes, he had a couple of shots." Trooper Sentak thereafter asked [Gindraw] to exit his vehicle so that he could conduct several standard field sobriety tests. Trooper Sentak recalled conducting several standard field sobriety tests. . ..

Decision and Order, 2/11/22, at 2-3 ¶¶ 1-21 (record citations and some footnotes omitted, and formatting changed).

The troopers arrested Gindraw and charged him with driving under the influence. Gindraw filed a suppression motion challenging the admission of all evidence resulting from the illegal seizure of him and his vehicle. *See* Omnibus Pretrial Motion, 11/29/21. Gindraw's motion asserted that the activation of the police lights and the approach of the troopers with illuminated flashlights on each side of the car constituted an investigative detention because a reasonable person would not have felt free to leave, the troopers lacked reasonable suspicion at the time they initiated the investigation, and all evidence resulting from the stop should be suppressed as the fruit of the poisonous tree. *See id*. at 1-7.

The suppression court held a hearing at which Trooper Sentak was the only witness. The suppression court found that Trooper Sentak properly conducted an investigative detention of Gindraw under the public servant provision of the community caretaking doctrine. The court held that: Gindraw's use of his hazard lights provided specific and objective facts for the trooper to believe he might have a problem with his car; Trooper Sentak's brief conversation with Gindraw did not derive from an unlawful purpose to detect or investigate a crime or acquire criminal evidence; and the trooper reasonably and appropriately tailored his actions to rendering assistance. *See id*. at 7-12, distinguishing *Commonwealth v. Livingstone*, 174 A.3d 609, 627 (Pa. 2017). After denying Gindraw's motion to suppress, the court convicted Gindraw at a non-jury trial of driving under the influence and on April 18, 2022, imposed its sentence. Gindraw timely appealed, and he and the trial court complied with Pa.R.A.P. 1925.

Gindraw raises the following issue for our review:

> Did the trial court err in denying [Gindraw's] motion to suppress where [Gindraw] was subjected to a detention not supported by reasonable suspicion or justified by the public servant exception?

Gindraw's Brief at 7.

When reviewing an order denying a motion to suppress evidence,

> Our standard of review . . . is limited to determining whether the findings of fact are supported by the record and whether the legal conclusions drawn from those facts are in error. In making this determination, this [C]ourt may only consider the evidence of the Commonwealth's witnesses, and so much of the witnesses for the defendant, as fairly read in the context of the record as a whole,

which remains uncontradicted. If the evidence supports the findings of the trial court, we are bound by such findings and may reverse only if the legal conclusions drawn therefrom are erroneous.

*Commonwealth v. Freeman*, 128 A.3d 1231, 1240 (Pa. Super. 2015) (internal citations omitted).

Here, Gindraw, the Commonwealth, and the suppression court agree that the stop in this case constituted an investigative detention and the legality of that detention and resulting DUI investigation depends on whether the Commonwealth satisfied *Livingstone*'s test for the application of the public servant community caretaking doctrine exception to the warrant requirement. We agree that pursuant to *Livingstone*, Trooper Sentak's interaction with Gindraw was an investigative detention. *See Livingstone*, 174 A.3d at 625. We thus examine Gindraw's challenge to the application of the public servant/public safety exception.

Concerning the public servant exception, the Pennsylvania Supreme Court has explained that:

[i]n order to protect individuals against unreasonable searches and seizures, a right guaranteed by the Fourth Amendment, law enforcement generally must obtain a warrant prior to conducting a search. . . . [S]ome warrantless searches have been held not to violate state or federal constitutional privacy rights, even absent probable cause, for officer safety. . . .

* * * *

The community caretaking doctrine [an exception to the warrant requirement] . . . encompass[es] three specific exceptions: the emergency aid exception, the automobile/inventory exception,

- 5 -

and the public servant exception, also sometimes referred to as the public safety exception.

***Livingstone***, 174 A.3d at 625-629.

Having comprehensively reviewed police officers' multiple criminal and non-criminal responsibilities and other states' analyses of the public safety doctrine, the ***Livingstone*** court set forth a three-element test for determining when the doctrine may properly be invoked under Pennsylvania law:

> [I]n order for the public servant exception of the community caretaking doctrine to apply, police officers must be able to point to specific, objective, and articulable facts that would reasonably suggest to an experienced officer that a citizen is in need of assistance.
>
> * * * *
>
> Second . . . the police caretaking action must be independent from the detection, investigation, and acquisition of criminal evidence.
>
> * * * *
>
> We are not suggesting, however, that an officer's contemporaneous subjective concerns regarding criminal activity will preclude a finding that a seizure is valid under the community caretaking function.
>
> * * * *
>
> As an officer goes about his . . . duties, an officer cannot always ascertain which hat the officer will wear – his law enforcement hat or his community caretaker hat. ***For example, an officer may come upon what appears to be a stalled vehicle and decide to investigate if assistance is needed; however, the investigation may show that a crime is being committed within the vehicle. Therefore, from the point of view of the officer, he . . . must be prepared for either eventuality as the vehicle is approached. Accordingly, the officer may have law enforcement concerns, even when the officer has***

> *an objectively reasonable basis for performing a community caretaking function.*
>
> *To conclude otherwise would ignore the multifaceted nature of police work and force police officers to let down their guard and unnecessarily expose themselves to dangerous conditions.*
>
> \* \* \* \*
>
> [Third] . . . in order for the public servant exception to apply the level of intrusion must be commensurate with the perceived need for assistance.

*Livingstone*, 174 A.3d at 634-37 (parenthesis and internal citations omitted; emphasis added).

Gindraw asserts that the trial court erred in its weighing of the *Livingstone* factors. He asserts the trooper lacked specific, objective, and articulable facts to suggest Gindraw needed assistance because, contrary to Trooper Sentak's testimony that he suspected at the time of the stop that Gindraw's car might have a flat tire or an empty gas tank, Gindraw's car had neither problem. Gindraw also asserts the troopers acted to investigate, not assist, as demonstrated by the fact they both used their flashlights to look into his car, and that the level of intrusion far exceeded what was necessary to mitigate the peril. *See* Gindraw's Brief at 15-18.

The suppression court determined the facts *sub judice* supported the application of the public servant exception. It credited Trooper Sentak's testimony that his training and experience taught him that hazard lights are frequently used to signal a vehicle's disability and increase its visibility. *See*

- 7 -

Decision and Order, 2/11/22, at 8. In the court's view, Gindraw's use of his hazard lights, the time of night, and the darkness of the location indicated a possible problem with Gindraw's car. *See id*. at 9-10; Trial Court Opinion, 6/22/22, at 6.

The suppression court further found Trooper Gindraw acted reasonably to determine if Gindraw needed assistance, and the troopers' act of stopping their car behind Gindraw's car and brief conversation with him constituted acts completely independent from any unlawful purpose to detect, investigate, or acquire criminal evidence. *See* Decision and Order, 2/11/22, at 10; Trial Court Opinion, 6/22/22, at 7. Finally, the court concluded that the level of intrusion was commensurate with the perceived need for assistance. *See* Decision and Order, 2/11/22, at 11-12; Trial Court Opinion, 6/22/22, at 7.

In sum, the court determined that the evidence satisfied all three elements of the *Livingstone* public servant exception to the warrant requirement: specific, objective, and articulable facts that would reasonably suggest to an experienced officer that a citizen is in need of assistance; the independence of the police's caretaking action from the detection, investigation, and acquisition of criminal evidence; and the degree of intrusiveness was commensurate with the perceived need for assistance. Accordingly, the court determined that Trooper Sentak did not violate Gindraw's rights when his brief questioning of Gindraw to determine if he needed assistance produced reasonable suspicion that Gindraw was driving

under the influence, permitting the performance of field sobriety tests. *See id*.

After a careful review of the record including the troopers' dash-cam video, we conclude that the record supports the suppression court's findings of fact and conclusions of law. First, the presence of Gindraw's vehicle on the side of the road after midnight in a dark area with its hazard lights flashing provided the experienced trooper with specific, objective, and articulable facts to suggest he might require assistance. *See Livingstone*, 174 A.3d at 632, citing *Ullom v. Miller*, 705 S.E.2d 111, 123 (W.Va. 2010) (under community caretaking doctrine, state trooper reasonably believed car occupant might be in need of immediate help where she was parked at dusk with her parking lights on in front of a gate blocking a dirt road).[2]

Second, the record supports the suppression court's finding the troopers' interaction with Gindraw independent of any unlawful purpose to detect, investigate, or acquire criminal evidence. The dash-cam video and audio show that Trooper Sentak's conversation with Gindraw lasted slightly more than one minute. The trooper greeted Gindraw by saying, "What's up, man . . . how are you?" After a brief conversational exchange, the trooper explained, "We just seen you sitting you here with your four-ways on, so we

_____

[2] *Compare Livingstone*, 174 A.3d at 638 (three-Justice plurality states that absence of a motorist's use of hazard lights undermined the assertion the motorist needed assistance).

weren't sure what was up," and then after Gindraw volunteered an explanation of where he had come from and where he was going, the trooper stated, "We just seen you sitting here with four-ways on and we figured we'd check on you to make sure you didn't run out of gas or nothing." *See* N.T., 11/29/21, at 24-25, Exhibit C-1. During the course of this conversation, the trooper recognized indicia that Gindraw had been drinking. He told Gindraw that the car reeked of alcohol and asked him to perform field sobriety tests. *See id*.; *see also* Decision and Order, 2/11/22, at 3-4 (finding that in the course of a "one to two minute" conversation involving "generic questioning to determine whether [Gindraw] was in need of any assistance," Trooper Sentak observed that Gindraw's eyes were bloodshot and detected a very strong odor of alcohol emanated from his car). Additionally, some of that brief conversation consisted of Gindraw's narration of where he had been. The trooper's interaction with Gindraw epitomizes the scenario *Livingstone* and other courts contemplated when they rejected the notion that an officer must have completely ruled out any possibility of criminal activity before exercising the community caretaker function. *See Livingstone*, 174 A.3d at 636. *Livingstone* specifically rejected that rule that an investigation must be "totally divorced" from the detection of criminal activity to be valid when it stated that "a coinciding subjective law enforcement concern by the officer will not negate the validity of that search under the public servant exception to the community caretaking doctrine." *See id*. at 637.

Finally, Trooper Sentak's interaction with Gindraw constituted a minimal intrusion. **See Livingstone**, 174 A.3d at 630, citing **State v. Anderson**, 362 P.3d 1232, 1239-40 (Utah 2015) (concluding the seizure of a motorist stopped at the side of a highway in below-zero temperatures with his vehicle's hazard lights on was "minimally invasive" because: (1) the vehicle was parked, not driving; (2) there was no excessive display of authority or force, including an absence of display or weapons or shouting of commands; and (3) the officer approached the motorist only long enough to approach his vehicle and ask whether he needed aid).

Here, Gindraw was parked on the side of the road; his car was stopped and he had his hazard lights on. Additionally, the intrusion was minimal because it was short and not conducted for the purpose of detecting crime. The trooper's use of flashlights to see inside and around the outside of Gindraw's car did not change the nature of the search. Given the time of night and Gindraw's use of his hazard lights, the troopers' attempt to determine if Gindraw or a possible passenger required assistance or whether there were any safety concerns with his car was commensurate with the perceived need for assistance.

Thus, the suppression court did not err in finding the public servant exception applied: the trooper had specific, objective, and articulable facts that suggested Gindraw was in need of assistance, the trooper's caretaking action was independent of the investigation of crime, and the level of intrusion

was commensurate with the perceived need for assistance. Because the suppression court's findings of fact have record support and the court did not commit an error of law, the court properly denied Gindraw's suppression motion. Accordingly, we affirm the order denying suppression of evidence of evidence following Trooper Sentak's investigative detention of Gindraw.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/23/2023