J-S34026-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| MATTHEW RYAN CIRILO AKA MATHEW RYAN CIRILO | : | |
| | : | |
| | : | No. 614 MDA 2025 |
| Appellant | : | |

Appeal from the Judgment of Sentence Entered October 12, 2023
In the Court of Common Pleas of Berks County Criminal Division at
No(s):  CP-06-CR-0000947-2023

BEFORE:  STABILE, J., SULLIVAN, J., and BENDER, P.J.E.

MEMORANDUM BY SULLIVAN, J.:          **FILED: FEBRUARY 2, 2026**

Matthew Ryan Cirilo, aka Mathew Ryan Cirilo ("Cirilo"), appeals *nunc pro tunc* from the judgment of sentence imposed after the trial court denied his motion to suppress and found him guilty of possession of firearms and firearms not to be carried without a license.[1]  In his sole issue on appeal, Cirilo contends he was entitled to the suppression of a firearm that came into view after police removed him from his vehicle during a traffic stop.  Cirilo, in relevant part, claims that police removed him from his vehicle based on mistaken information about the spelling of his first name and the status of his driver's license.  Because the trial court properly determined the firearm came into plain view during the lawful course of a traffic stop, we affirm.

_____

[1] **See** 18 Pa.C.S.A. §§ 6105, 6106.

The trial court found the following facts relevant to this appeal:

1.  On February 22, 2023, [Criminal Investigator ("C.I.") Shavon] Salata was conducting surveillance in the 900 block of Elm Street, Reading, Berks County, Pennsylvania.

2.  While conducting surveillance, C.I. Salata observed a silver Dodge Nitro make an illegal U-turn at North Penn Street and Elm Street. The Dodge Nitro blocked traffic while making the turn. C.I. Salata observed that Cirilo was the operator.

3.  C.I. Salata was familiar with Cirilo as she knew him from prior criminal encounters. She purchased drugs and a firearm from him in 2013.

4.  C.I. Salata knew that Cirilo did not have a driver's license[,] as she had run his name though JNET a week earlier when she believed she had seen him. She spelled his name as "Matthew Cirilo." [After the filing of charges in this case, s]he subsequently learned that the legal spelling of Cirilo's name is "Mathew Cirilo" with one "t," not two. "Mathew Cirilo" had a valid driver's license on February 22, 2023.

5.  After seeing Cirilo make the illegal U-turn, C.I. Salata contacted C.I. [James] Gresh. C.I. Gresh was in an unmarked police vehicle with C.I. [Timothy] Morris and [another investigator]. They were able to position their vehicle behind Cirilo in the Dodge Nitro approximately one minute after receiving the call from C.I. Salata. They observed that Cirilo's br[ake] light was not working.

6.  C.I. Morris ran Cirilo through SCOPE and learned that his license was suspended. [C.I. Gresh and Morris] activated their lights and siren to initiate a traffic stop.

7.  C.I. Gresh approached the Dodge Nitro and came into contact with Cirilo, the sole occupant and operator of the vehicle.

8.  Cirilo provided C.I. Gresh with a Pennsylvania driver's license identifying him as "Mathew Cirilo." C.I. Morris then explained the reason for the traffic stop to Cirilo which

included the suspension of [Cirilo's] driver's license.[2] Cirilo wouldn't make eye contact with C.I. Morris and his hands were shaking.

9.  Cirilo was asked to exit the vehicle but initially refused. He said that his driver's license was valid. Cirilo eventually exited the vehicle and, at that time, C.I. Gresh and C.I. Morris observed a black handgun on the driver's seat.

10. Cirilo was taken into custody and transported to City Hall. The Dodge Nitro was also driven to City Hall as the vehicle was parked in the middle of Cedar Street and there was no other person available to operate the vehicle.

11. C.I. Gresh looked at Cirilo's prior criminal history earlier that day and saw that there were prior arrests for Cirilo with the first name of "Matthew" and "Mathew."

12. After the charges were filed against Cirilo, C.I. Morris ran Cirilo's driving history and learned that "Matthew Cirilo" with an [operating license number ("OLN")] of [-]3046 [("the -3046 license")] was suspended.

13. A second driver's history was subsequently run for a "Mathew Cirilo" with an OLN of [-]9910 [("the -9910 license")]. This license was valid on the date of the traffic stop.

Findings of Fact and Conclusions of Law, 5/20/25, at 2-3.

Cirilo filed an omnibus pretrial motion, wherein he requested suppression of the firearm because the stop was based on a hunch that he was engaged in criminal activity and the investigators did not have a valid basis to order him out of the vehicle to tow the vehicle for driving with a suspended license. *See* Omnibus Pretrial Motion, 4/12/23, at 5; *see also*

---

[2] C.I. Morris testified at a suppression hearing that, during the traffic stop, he and C.I. Gresh told Cirilo his license was suspended, he would not be able to drive the vehicle, and they would have the vehicle towed. *See* N.T., 7/24/23, at 29-30.

N.T., 7/24/23, at 51. Following a suppression hearing, the trial court denied Cirilo's suppression motion. At a stipulated bench trial on October 12, 2023, the trial court found Cirilo guilty of the above-stated firearms offenses and, that same day, sentenced him to an aggregate term of five to ten years of imprisonment.

Cirilo took a direct appeal, which this Court dismissed after he failed to file a brief. Cirilo timely filed a Post Conviction Relief Act ("PCRA") petition,[3] and the PCRA court reinstated his direct appeal rights in April 2025. Cirilo timely filed a notice of appeal *nunc pro tunc*, and both he and the trial court complied with Pa.R.A.P. 1925.[4]

Cirilo raises the following issue for our review:

1. Whether the trial court erred in denying [Cirilo's] motion to suppress physical evidence where [he] was unlawfully removed from the motor vehicle that he was operating[,] for the specific purpose of towing the vehicle based upon law enforcement's inaccurate information [concerning] the proper spelling of [his] legal name and the suspension of his driving privileges[,] despite [his] providing law enforcement with a valid driver's license that was not suspended whereupon law enforcement located an illegal firearm inside the vehicle?

Cirilo's Brief at 5 (some capitalization omitted).

Our standard of review over an order denying a motion to suppress:

is limited to determining whether the findings of fact are supported by the record and whether the legal conclusions drawn from those facts are in error. In making this determination, this

---

[3] **See** 42 Pa.C.S.A. §§ 9541-9546.

[4] The trial court relied on its findings of fact and conclusions of law when denying Cirilo's suppression motion.

Court may only consider the evidence of the Commonwealth's witnesses, and so much of the witnesses for the defendant, as fairly read in the context of the record as a whole, which remains uncontradicted. If the evidence supports the findings of the trial court, we are bound by such findings and may reverse only if the legal conclusions drawn therefrom are erroneous.

*Commonwealth v. Gindraw*, 297 A.3d 848, 851 (Pa. Super. 2023) (internal citation and brackets omitted).

As this Court has stated:

The Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution protect individuals from unreasonable searches and seizures, thereby ensuring the right of each individual to be let alone. A warrantless search or seizure is presumptively unreasonable under the Fourth Amendment and Article I, § 8, subject to a few specifically established, well-delineated exceptions. These exceptions include . . . the plain view exception . . . [and] the stop and frisk exception[.[5]]

*Commonwealth v. Smith*, 285 A.3d 328, 332 (Pa. Super. 2022) (internal citations and quotation marks omitted).

A traffic stop is "[a] relatively brief encounter . . . more analogous to a . . . *Terry* stop . . . than to a formal arrest." *See Rodriguez v. U.S.*, 575 U.S. 348, 354 (2015) (internal citations and quotation marks omitted). During a traffic stop, an officer "may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions." *Berkemer v. McCarty*, 468 U.S. 420,

---

[5] *See Terry v. Ohio*, 392 U.S. 1, 21-24 (1968); *Commonwealth v. Hicks*, 208 A.3d 916, 933 (Pa. 2019) (noting that *Terry* upheld the constitutionality of the "stop and frisk").

439 (1984); **Commonwealth v. Ross**, 297 A.3d 787, 793 (Pa. Super. 2023). If police develop additional suspicions before the mission of the traffic stop is complete, they may continue the stop to investigate the new suspicions. **See Commonwealth v. Chase**, 960 A.2d 108, 115, n.5 (Pa. 2008).

Moreover, "[w]hen a police officer lawfully stops a motorist for a violation of the Pennsylvania Motor Vehicle Code, the officer is permitted to ask the driver to step out of the vehicle 'as a matter of right.'" **Commonwealth v. Parker**, 957 A.2d 311, 314-15 (Pa. Super. 2008) (internal citation omitted). When the officer requests an occupant of the vehicle to exit and contraband comes into plain view, the officer may seize the contraband without a warrant. **See Commonwealth v. Bumbarger**, 231 A.3d 10, 20 (Pa. Super. 2020) (noting that the plain view exception applies when: "(1) an officer views the object from a lawful vantage point; (2) it is immediately apparent him that the object is incriminating; and (3) the officer has a lawful right of access to the object").[6]

On appeal, Cirilo maintains that the investigator unlawfully removed him from his vehicle due to the investigators' reliance of a factual error. **See** Cirilo's Brief at 10, 14. He contends that "[t]he only reason [the investigators] removed him from the vehicle was so police could have the vehicle towed."

---

[6] Although not discussed at length by Cirilo, we note his suppression and appellate arguments challenged the first prong of the plain view exception, namely, whether the investigators were in a lawful position when the viewed the firearm.

*Id*. Cirilo asserts that there was no need to tow the vehicle because he had the valid -9910 license. *Id*.

The trial court, when denying Cirilo's suppression motion, determined that police had probable cause to stop Cirilo based on C.I. Salata's observation of Cirilo making an improper U-turn and C.I. Gresh's and Morris's independent observations that Cirilo's vehicle did not have a working brake light. *See* Finding of Fact and Conclusions of Law, 5/20/25, at 5-6. Citing *Bumbarger*, the court concluded that because C.I. Gresh and Morris lawfully stopped Cirilo, they were permitted to remove Cirilo from the vehicle regardless of the status of Cirilo's license. *See id*. at 6-7.

We discern no error in the trial court's denial of Cirilo's suppression motion. Cirilo no longer disputes the investigators had probable cause to stop him based on the illegal U-turn and the broken brake light. *See* Cirilo's Brief at 12-13; *see generally Commonwealth v. Harris*, 176 A.3d 1009, 1019 (Pa. Super. 2017) (noting that "[f]or a stop based on the observed violation of the Vehicle Code or otherwise non-investigable offense, an officer must have probable cause to make a constitutional vehicle stop"). The trial court properly concluded that the investigators had an absolute right to ask Cirilo to exit the vehicle during a lawful traffic stop. *See Bumbarger*, 231 A.3d at 20. Moreover, the investigators had the authority to remove Cirilo from the vehicle regardless of their subjective motivations. *See id*.; *see also Ohio v. Robinette*, 519 U.S. 33, 38 (1996) (noting that "in light of the admitted probable cause to stop Robinette for speeding, [an officer] was objectively

justified in asking Robinette to get out of the car, subjective thoughts notwithstanding"). Once Cirilo complied with the request to exit the vehicle, the firearm came into plain view while the investigators were in a lawful position to observe it. **See Bumbarger**, 231 A.3d at 20. Thus, the trial court properly denied Cirilo's suppression motion.

We note that Cirilo's arguments in this appeal present a new legal theory for relief—that the investigators unreasonably prolonged the initial traffic stop for an illegal U-turn. **See** Cirilo's Brief. 13-14. Cirilo suggests that after he presented the investigators with a valid license, the investigators' authority was limited to issuing a citation and then allowing him to leave. **See id**. at 13. Cirilo contends the only reasons the investigators prolonged the stop and ordered him to exit the vehicle were their mistaken beliefs about the spelling of his legal first name, the status of his license, and the apparent need to tow his vehicle because he did not have a valid license. **See id**.

We conclude Cirilo waived these arguments by failing to raise them in his suppression motion or at the suppression hearing. Although Cirilo argued to the trial court that the investigators unlawfully removed him from his vehicle due to factual errors, he did not assert that the investigators unreasonably prolonged an otherwise valid traffic stop. **See** Omnibus Pretrial Motion, 4/12/23, at 5; **see also** N.T., 7/24/23, at 51. Therefore, Cirilo did not preserve his arguments for appeal. **See** Pa.R.Crim.P. 581(D) (requiring a suppression motion to state specifically and with particularity the evidence to be suppressed, the grounds for suppression, and the facts and events

therefor); *see also* Pa.R.A.P. 302(a) (noting that issues not raised in the trial court cannot are waived and cannot be raised for the first time on appeal).

Even if preserved, Cirilo's arguments would not merit relief because the investigators had reasonable suspicion to believe that Cirilo's driver's license was suspended and, therefore, did not unreasonably prolong the stop.

This Court has emphasized:

> In the context of a traffic stop, the United States Supreme Court held that the duration of police inquiries "is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop . . . and attend to related safety concerns." *Rodriguez*, 575 U.S. at 354 (citations omitted). A stop becomes unlawful when it "last[s] . . . longer than is necessary" to complete its mission, the rationale being that the "[a]uthority for the seizure . . . ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." The Supreme Court elaborated that "[t]he critical question . . . is not whether the [inquiry] occurs before or after the officer issues a ticket . . . but whether [it] prolongs—, *i.e.*, adds time to—the stop . . . .. An officer . . . may conduct certain unrelated checks during an otherwise lawful traffic stop. But . . . he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual.

*Ross*, 297 A.3d at 792 (internal citations omitted).

Our case law holds that police may stop a vehicle on reasonable suspicion that the driver had a suspended license. *See Commonwealth v. Farnan*, 55 A.3d 113, 117 (Pa. Super. 2012); *cf*. *Commonwealth v. Schmidt*, 309 A.3d 1052, 2023 WL 7993203, at *1, 4 (Pa. Super. 2023) (non-precedential memorandum decision) (concluding that traffic stop was justified based on information from a computer search that Schmidt's license was suspended, even though Schmidt's license was not suspended); Pa.R.A.P.

126(b).  An officer's personal observations and knowledge of a defendant's license status may alone provide reasonable suspicion to believe the defendant did not have a valid license.  ***See Farnan***, 55 A.3d at 118. Moreover, an officer may rely on information from police computer searches. ***See Commonwealth v. Hilliar***, 943 A.2d 984, 990 (Pa. Super. 2008); ***Schmidt***, 2023 WL 7993203 at *1, 4.

The reasonable suspicion standard does not require perfect accuracy. ***See Commonwealth v. Chase***, 960 A.2d 108, 120 (Pa. 2008); ***see also Heien v. North Carolina***, 574 U.S. 54, 60-61 (2014) (noting that the "touchstone of the Fourth Amendment is reasonableness.  To be reasonable is not to be perfect, and so the Fourth Amendment allows for some mistakes on the part of government officials").  "[S]tops based on factual mistakes generally are constitutional if the mistake is objectively reasonable." ***Chase***, 960 A.2d at 120 (internal citations omitted).

In the present case, the investigators had reasonable suspicion to stop and investigate Cirilo for a suspended license.  ***See Farnan***, 55 A.3d at 117. C.I. Salata was personally familiar with Cirilo, having bought drugs and a firearm from him in 2013.  ***See*** N.T., 7/24/23, at 5-6; ***see also*** Findings of Fact and Conclusions of Law, 5/20/25, at 2.  She believed that Cirilo did not have a valid driver's license, and one week before the traffic stop, she searched JNET and received information his -3046 license under the name "Matthew" was suspended.  ***See*** N.T., 7/24/23, at 6-7; ***see also*** Findings of Fact and Conclusions of Law, 5/20/25, at 2.  Immediately before the traffic

stop, C.I. Morris also requested a records check through SCOPE, and the operator told him that Cirilo's license was suspended. ***See*** N.T., 7/24/23, at 27-28; Findings of Fact and Conclusions of Law, 5/20/25, at 2. On these bases, the investigators had reasonable suspicion to stop Cirilo for driving with a suspended license and investigate the status of his license. ***See Farnan***, 55 A.3d at 118; ***Hilliar***, 943 A.2d at 990; ***cf***. ***Schmidt***, 2023 WL 7993203 at *1, 4.[7]

The facts that the investigators were unaware of the spelling of Cirilo's legal first name with one "t," and that Cirilo used his legal name to obtain the valid -9910 license, did not vitiate the reasonable suspicion to investigate the

_____

[7] We find persuasive our non-precedential memorandum decision in ***Schmidt***. ***See*** Pa.R.A.P. 126(b). In that case, an officer observed Schmidt driving, and a computer search of the license plate number of Schmidt's car returned inaccurate information that Schmidt's license was suspended. ***See Schmidt***, 2023 WL 7993203 at *1-2. The officer stopped Schmidt for driving with a suspended license but, during the stop, determined Schmidt was driving under the influence of alcohol. Following the denial of his suppression motion and conviction for the latter offense, he appealed.

On appeal, Schmidt claimed, *inter alia*, the computer record that his license had been suspended was incorrect because he had only been issued a warning that his license would be suspended for failing to pay child support and the suspension had not taken effect. ***See id***. at *2. This Court agreed that Schmidt's license had not been suspended on the day of the stop. ***See id***. However, we concluded that suppression was not warranted because the arresting officer had reasonable suspicion to conduct the stop based on the inaccurate information. ***See id***. at *4. While the principal issue in ***Schmidt*** involved the good-faith exception to the exclusionary rule, ***see id***. at *3-4, the conclusion in that case—that reasonable suspicion existed to investigate despite a factual mistake—is particularly apt to the present case.

status of his license. As C.I. Gresh testified, after requesting that Cirilo step out of the vehicle, the following transpired:

> He did not want to step out. After I asked him to step out, he was like oh, no I'm not suspended. I was like, well, our SCOPE operator is telling us you're suspended. Step out and we'll continue to talk to you.
>
> He didn't want to step out. Eventually he did step out, I observed a black Glock handgun sitting on the driver's seat from underneath . . . Cirilo.

N.T., 7/24/23, at 17.

As noted above, an officer may ask a moderate number of questions and obtain information confirming or dispelling the officer's suspicions during a lawful traffic stop. **See Ross**, 297 A.3d at 793. Here, when presented with conflicting information that Cirilo's -3046 license was suspended but that Cirilo had the valid -9910 license, the investigators had reasonable suspicion to continue to investigate the status of Cirilo's license and order Cirilo to exit the vehicle, which ultimately resulted in the firearm coming into plain view. **See id**.; **Bumbarger**, 231 A.3d at 20. To the extent there were factual mistakes regarding the spelling of Cirilo's first name or his possession of the valid -9910 license, those mistakes were objectively reasonable under the circumstances of this case. **Cf**. **Schmidt**, 2023 WL 7993203 at *1, 4.[8] Therefore, even if

---

[8] We note that Cirilo did not dispute the accuracy of any records for the suspended -3304 license, nor did he assert the records belonged to another person. **See** N.T., 7/24/23, at 41, 38, 45-46; **see also** Commonwealth's Exhibit 1. Despite the spelling of his legal first name with one "t," Cirilo had acknowledged "Matthew" as an alias. **See** Defense Exhibit 4. Cirilo's criminal
*(Footnote Continued Next Page)*

preserved, Cirilo's arguments that the investigators unlawfully prolonged the traffic stop would afford him no relief. **See Commonwealth v. Gibson**, 333 A.3d 710, 722 (Pa. Super. 2025) (noting this Court may affirm a suppression court on an alternative basis that is supported by the record).

Because Cirilo has shown no error in the trial court's decision to deny his suppression motion, his sole issue in this appeal fails. **See Gindraw**, 297 A.3d at 851. Accordingly, we affirm the judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 2/2/2026

---

records were listed under the first name "Matthew," and while some of prior criminal records also used his legal first name "Mathew," none of the investigators were aware of the spelling of his legal first name until Cirilo's arrest for possessing the firearm. **See** N.T., 7/24/23, at 7, 9-10, 20, 23, 25.