J-S30012-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA   :    IN THE SUPERIOR COURT OF
                                         :             PENNSYLVANIA
                                         :
          v.                            :
                                         :
                                         :
BERNARD REDDICK                   :
                                         :
          Appellant            :     No. 521 EDA 2024

Appeal from the Judgment of Sentence Entered August 21, 2023
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0002348-2021

BEFORE:   OLSON, J., MURRAY, J., and FORD ELLIOTT, P.J.E.[*]

MEMORANDUM BY OLSON, J.:         **FILED SEPTEMBER 10, 2025**

Appellant, Bernard Reddick, appeals from the judgment of sentence entered on August 21, 2023, as made final by the denial of Appellant's post-sentence motion on January 8, 2024.  We affirm.

The trial court thoroughly summarized the underlying facts of this case:

> On July 16, 2020, Tyreese Parker robbed Appellant near the intersection of 11th Street and Loudon Street in Philadelphia, Pennsylvania.  After the robbery, video footage showed Appellant leave the area in a silver Chevrolet Equinox SUV, return[ two] minutes later in the same vehicle, fire multiple shots into a crowd of people, which included Mr. Parker, standing at the intersection, and then depart the scene, driving west on Loudon Street.  Syheeb Sharpe, who was amongst the crowd, was struck by one of the rounds fired by Appellant and died from his injuries shortly thereafter.  The Philadelphia Police Department initiated an investigation into the murder of Mr. Sharpe and placed Appellant's vehicle in felony "Want" status in the National Crime Information

_____

[*] Retired Senior Judge assigned to the Superior Court.

Center (NCIC) database, as a matter of interest in the investigation.

On August 7, 2020, Pennsylvania State Police Sergeant Thomas Hornung pulled Appellant over in Ashland, Pennsylvania as part of a routine traffic stop. During the stop, Sergeant Hornung discovered that Appellant's vehicle was in felony "Want" status, and seized the vehicle on behalf of the Philadelphia Police Department. While preparing to tow Appellant's silver Chevrolet Equinox, State Troopers observed a fired cartridge casing (FCC) lodged underneath the windshield wiper housing unit on the outside of Appellant's vehicle in plain view. Forensic testing later revealed that the FCC from Appellant's vehicle and FCCs from the scene of Mr. Sharpe's murder were all of the same caliber and were fired from the same firearm.

Appellant was subsequently arrested and charged with [multiple crimes, including the murder of Mr. Sharpe]. At trial, the Commonwealth presented [ten] witnesses as part of its case-in-chief against Appellant: Philadelphia Police Officers Walter Wyatt and Robert Flade, Philadelphia Police Detectives Thorsten Lucke, Lawrence Flagler, and Frank Mullen, Pennsylvania State Sergeants [Alaina] Hunt and Thomas Hornung, Pennsylvania State Police Trooper Andrew Letcavage, Dr. Victoria Sorokin, and Tyreese Parker. The trial evidence and testimony presented at trial are summarized below.

Philadelphia Police Officer Walter Wyatt testified that he was on duty patrolling the 35th district in Philadelphia on July 16, 2020 when, at 12:05 a.m., he received a priority radio assignment for a report of a shooting incident. Officer Wyatt explained that he arrived at the intersection of 11th and Loudon Street and observed the victim, Syheeb Sharpe, receiving medical attention from a nearby fire station unit for a gunshot wound to his left hip. Officer Wyatt further testified that he followed the unit, as they transported and continued treatment of Mr. Sharpe, to Albert Einstein Medical Center where Mr. Sharpe was later pronounced dead at 12:38 a.m. Officer Wyatt stated that, after the incident, he prepared a 75-48 incident report, noting the dark-colored vehicle last seen travelling westbound on Loudon Street from the site of the shooting.

- 2 -

Doctor Victoria Sorokin, an expert in forensic pathology who performed the autopsy of Mr. Sharpe, testified that the cause of Mr. Sharpe's death was a gunshot wound to his lower back and the manner of his death was a homicide. During her autopsy of Mr. Sharpe, Dr. Sorokin noted a wound to the lumbar region of Mr. Sharpe's back where the bullet entered, traveled through the musculature of Mr. Sharpe's back, hit the bone, and fragmented. Dr. Sorokin stated that the shattered bullet fragments then continued to travel through Mr. Sharpe's body, causing critical internal injuries and resulting in Mr. Sharpe's death. Dr. Sorokin further opined that, based on the location of the entrance wound and the trajectory of the bullet, Mr. Sharpe was likely facing away from the shooter, his back facing the barrel of the gun. Additionally, Dr. Sorokin testified that Mr. Sharpe's toxicology report was negative for both alcohol and "drugs of abuse," and that each of her findings were to a reasonable degree of medical and scientific certainty.

Philadelphia Police Sergeant Alaina Hunt, who was on patrol in the 35th District at the time of the shooting, testified that she responded to the scene of the crime after hearing gunshots and receiving a call over dispatch about a male shot on the highway at 11th and Loudon Street. Upon arrival, Sergeant Hunt secured the crime scene for the collection of evidence and any real-time camera footage of the scene. Sergeant Hunt then received information regarding a person of interest dressed in all white, who appeared to have a gun at his waist, from the real-time camera footage in the vicinity of the crime scene. Sergeant Hunt subsequently relayed this information to detectives and directed Officer Gallagher to prepare a crime scene log documenting the evidence and investigation.

Philadelphia Police Officer Robert Flade of the Crime Scene Unit (CSU) testified in lieu of the late Officer Lamont Fox, the original technician assigned to this case, regarding the evidence collected at the scene of the July 16, 2020 shooting. Officer Flade testified that the Crime Scene Unit took [31] photos of the scene and retrieved [seven] FCCs from the vicinity – [five] from a USA [9mm] Luger caliber firearm, and [two] from a .40 Smith & Weston [] firearm. While the [five 9mm] FCCs were found scattered along the street in the

vicinity of the 11th and Loudon Street intersection, the [two] .40 S&W FCCs were located further west from the vicinity of the shooting.

Detective Frank Mullen, the lead investigator assigned to the case, testified that he arrived at the crime scene at 1:40 a.m., and observed a Philadelphia Police Department camera at 11th and Loudon Street. Detective Mullen explained that he spoke with Officer Brown of the Real-Time Crime Center, who reviewed the footage from the 11th and Loudon Street camera, and informed Detective Mullen of a person of interest seen on video wearing an all-white outfit with distinctive back pockets, carrying a handgun. Officer Brown further informed Detective Mullen that the individual was likely still in the vicinity of the crime scene and sent Detective Mullen a still image of the individual from the real-time footage. Detective Mullen subsequently approached an individual seated on a porch at 1113 West Loudon Street who matched Officer Brown's description and the still image, identified the individual as Tyreese Parker, and arranged to have Mr. Parker transported to homicide to give a statement. On Mr. Parker's person, Detective Mullen found [] a bottle of Oxycodone pills prescribed to Appellant, listing Appellant's home address of 6118 Locust Street.

The Commonwealth read into the record the preliminary hearing testimony of Tyreese Parker, who was unavailable at the time of Appellant's trial. At the preliminary hearing, Mr. Parker testified that he was "shooting dice" at the corner of 11th and Loudon Street in Philadelphia, on July 16, 2020. Mr. Parker further admitted to purchasing an "E pill" from an individual he described as "old head," and later getting into a physical altercation with this "old head" which resulted in Mr. Parker shoving him. Mr. Parker testified that [the] "old head" then got into his car, pulled off, and returned to the corner, where Mr. Parker claimed numerous people were present. Mr. Parker then recalled hearing gunshots and, subsequently, seeing Syheeb Sharpe lying on the ground. Finally, Mr. Parker recalled giving a statement to homicide detectives regarding the incident.

Detective Mullen subsequently recovered both the real-time footage as well as video footage from [three] nearby stores in the surrounding area - a Q&R Market at the intersection of

Marvine and Loudon Street, a "Monty Market" at 6100 Locust Street, and a Boombox Deli at 11th and South Loudon Street. Detective Thorsten Lucke, an expert in digital surveillance and video recovery analysis, testified to reviewing all the footage supplied by Detective Mullen. Detective Lucke noted that, at the 11:50 p.m. mark on July 15, 2020, the camera at the Boombox Deli showed an individual wearing a number [11] Eagle's jersey and a baseball hat park a silver SUV at the corner of the street, exit the vehicle, walk into the view of the real-time pole camera, and engage in "gambling" and "dice games" with Decedent and an individual dressed in all white with distinctive designs on his back pockets.

Detective Lucke further testified to a physical altercation which the real-time camera captured at 12:03 a.m. on July 16, 2020. Detective Lucke observed the individual dressed in all white grabbing at the pocket area of the individual in the Eagle's jersey as the latter lay on the ground. The real-time camera then showed the individual in the Eagle's jersey, after receiving assistance from bystanders in the area, exit the scene in his silver Chevy SUV, heading East on Loudon from 11th Street, at 12:05 a.m. At 12:07 a.m., the Boombox Deli camera captured footage of the movements of the silver Chevy SUV circling the block and reapproaching the 11th and Loudon Street intersection. Detective Lucke testified to the occurrence of a shooting and observed the Decedent collapse on the corner, several bystanders in the vicinity run in the opposite direction of the cameras, and the SUV depart the scene at a high rate of speed, traveling west on Loudon Street with the driver-side window open.

Detective Mullen testified to reviewing the real-time video footage of the 11th and Loudon Street intersection himself and observing Mr. Parker - identifiable by his all-white outfit and the distinctive designs on the back pockets of his shorts - rob an individual wearing an [Eagles] t-shirt. Detective Mullen testified to seeing Mr. Parker throw this individual to the ground, remove an item from that individual's pocket, and place it in his own. Detective Mullen then observed the individual in the Eagles t-shirt exit the scene in a silver Chevy SUV and return minutes later in a "light-colored" SUV. Detective Mullen stated that the real-time camera panned away from the crime scene at the time of the shooting but noted that he did observe members of the crowd "scatter"

after the shooting occurred. Using police databases and the torn prescription label on the pill bottle retrieved from Mr. Parker, Detective Mullen was able to generate a photo of Appellant which Detective Mullen used to confirm Appellant's identity as the individual from the real-time footage who was robbed by Mr. Parker.

Detective Mullen subsequently searched the surrounding area of Appellant's residence at 6118 Locust Street and inquired into any vehicles registered to Appellant. Thereafter, the Pennsylvania State police informed Detective Mullen of a silver 2007 Chevrolet Equinox registered in Appellant's name, which Detective Mullen entered in the Pennsylvania Criminal Information Computer (PCIC) and the National Criminal Information Computer (NCIC) databases as wanted in connection with a murder in Philadelphia.

Pennsylvania State Police Sergeant Thomas Hornung testified that, on August [7, 2020], while on patrol in Ashland, Pennsylvania, he witnessed a gray Chevrolet Equinox commit a Motor Vehicle Code violation. After stopping the vehicle and running its license plate through the NCIC database, Sergeant Hornung discovered that there was a warrant for the vehicle in connection to a homicide in Philadelphia. Sergeant Hornung subsequently called for backup and detained the driver, who Sergeant Homburg described as wearing a "Carson Wentz" jersey, for an investigation of the vehicle. After pulling the driver from the vehicle and handcuffing him, Sergeant Hornung explained to the driver that he was not under arrest and that his vehicle was in "wanted" status.

Detective Lucke testified to reviewing the dash camera footage from the August 7, 2020 vehicle stop and identified the Chevrolet Equinox from the footage as the same Chevrolet SUV involved in the July 16, 2020 shooting. Detective Lucke further identified Appellant as the driver from the vehicle stop, noting that the Number 11 Eagles "Wentz" jersey, which the driver was wearing in reverse, was consistent with the Eagles jersey Appellant was wearing on the night of the shooting.

Pennsylvania State Police Trooper Andrew Letcavage testified that he responded to Sergeant Hornburg's request for backup

and assisted in both the traffic stop and the investigation of Appellant's vehicle. He testified that he performed the inspection of the vehicle's exterior and observed, in plain view, an FCC originating from a [9mm] Lugar caliber firearm in the windshield wiper housing unit on the driver's side of the vehicle. Trooper Letcavage testified that he later photographed, recovered, and submitted these FCCs for forensic testing. Following the examination of Appellant's vehicle, Sergeant Hornburg arranged to have Appellant driven to his Ashland, Pennsylvania residence, and impounded Appellant's vehicle for retrieval by the Philadelphia Police Department.

Detective Mullen testified to obtaining a search warrant for the vehicle, which was subsequently executed by Philadelphia Police Officer Robert Flade of the Crime Scene Unit. In lieu of the late Officer Lamont Fox, the original technician assigned to this case, Officer Flade testified regarding the evidence collected at the scene of the July 16, 2020 shooting and the subsequent examination of Appellant's vehicle. Officer Flade testified that the Crime Scene Unit retrieved [seven] FCCs from the vicinity of 11th and Loudon Street, [five] of which originated from a USA [9mm] Luger caliber firearm and were found scattered along the street in the vicinity of the 11th and Loudon Street intersection. Officer Flade further testified to applying a filter to the exterior of Appellant's vehicle for subsequent analysis for gunshot residue.

Philadelphia Police Officer Lawrence Flagler, an expert in firearms identification and analysis, confirmed that the FCC recovered from the August 7, 2020 traffic stop belonged to a [9mm] Luger caliber firearm. Officer Flagler testified that the 9mm Luger FCC that was recovered from Appellant's vehicle on August 7, 2020, and the five 9mm Luger FCCs that were recovered from the scene of the shooting all originated from the same firearm. Officer Flagler further testified that the bullet jacket recovered from Mr. Sharpe's body during his autopsy belonged to a [9mm] caliber firearm, though he could not confirm from which specific weapon it originated.

Additionally, Officer Flagler explained that the placement of the [five] 9mm FCCs from the July 16th shooting was consistent with some type of movement by the shooter.

Officer Flagler further explained that the ejection trajectory of an FCC from a [9mm] caliber firearm is over the right shoulder of the shooter. Accordingly, Officer Flagler concluded that, were a shooter to fire a [9mm] caliber firearm out of the driver's side front window of a vehicle, the FCCs could lodge in the various crevices in the windshield and car panels. Following the search of Appellant's vehicle and the discovery of the FCC, Detective Mullen issued an arrest warrant for Appellant which State Troopers executed at Appellant's home in Ashland, Pennsylvania.

. . .

On July 25, 2022, prior to trial, Appellant filed a motion to suppress physical evidence, arguing that the seizure of Appellant's vehicle violated his rights under the U.S. and Pennsylvania Constitutions. [The trial court] subsequently held a motion hearing on March 23, 2023, in which it heard testimony from Philadelphia Police Detective Frank Mullen and arguments from both the Commonwealth and Appellant's counsel. On March 30, 2023, after reviewing the testimony, evidence, arguments, and case law, [the trial court] denied Appellant's motion to suppress.

Appellant's jury trial commenced . . . on May 2, 2023. On May 9, 2023, after hearing all evidence and closing arguments from counsel, a jury found Appellant guilty of [third-degree murder, attempted murder, possessing instruments of crime, and two violations of the Uniform Firearms Act.[1]]

Trial Court Opinion, 12/20/24, at 1-10 (citations omitted).

On August 21, 2023, the trial court sentenced Appellant to serve an aggregate term of 22 to 44 years in prison for his convictions. Following the denial of Appellant's post-sentence motion by operation of law, Appellant filed a timely notice of appeal. Appellant raises the following claims on appeal:

_____

[1] 18 Pa.C.S.A. § 2502(c), 901, 907(a), 6106(a)(1), and 6108, respectively.

1. Did the trial court err when it denied Appellant's motion to suppress evidence recovered during the traffic stop because the evidence did not establish that there was reasonable suspicion or probable cause to enter his vehicle into the National Crime Information Center (N.C.I.C.) database?

2. Was the evidence sufficient to support Appellant's convictions where the only evidence implicating him was the prior testimony of a witness who was likely the actual shooter?

3. Were the verdicts against the clear weight of the evidence where the only evidence implicating Appellant in the crime was the prior testimony of an unavailable witness and that witness was likely the perpetrator?

4. Did the trial court err in finding that Tyreese Parker was an unavailable witness and allowing his prior testimony to be admitted?

Appellant's Brief at 5.

We have reviewed the briefs of the parties, the relevant law, the certified record, and the opinion of the able trial court judge, the Honorable Charles A. Ehrlich. We conclude that Appellant is not entitled to relief in this case, for the reasons expressed in Judge Ehrlich's well-reasoned December 20, 2024 opinion. Therefore, we affirm on the basis of Judge Ehrlich's able opinion and adopt it as our own. In any future filing with this or any other court addressing this ruling, the filing party shall attach a copy of Judge Ehrlich's December 20, 2024 opinion.

Judgment of sentence affirmed. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler

Benjamin D. Kohler, Esq.
Prothonotary


Date: <u>9/10/2025</u>

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
TRIAL DIVISION – CRIMINAL SECTION

| | | |
|---|---|---|
| Commonwealth of Pennsylvania | : | CP-51-CR-0002348-2021 |
| | : | |
| v. | : | |
| | : | SUPERIOR COURT NO: |
| Bernard Reddick | : | 521 EDA 2024 |

**Filed**

OPINION

DEC 2 0 2024

Ehrlich, J.

Office of Judicial Records
Appeals Unit

Bernard Reddick, hereinafter referred to as "Appellant," was found guilty by a jury on May 9, 2023, of Murder of the Third Degree, Attempted Murder, Possessing Instruments of Crime, and two (2) violations of the Uniform Firearms Act. Prior to trial, Appellant litigated a motion to suppress physical evidence, which this Court denied. This Court subsequently sentenced Appellant to an aggregate term of twenty-two (22) to forty-four (44) years of confinement. Appellant timely appealed his judgment of sentence, challenging the denial of his pre-trial motion to suppress physical evidence and the admission of preliminary hearing testimony of an unavailable witness, and raising sufficiency and weight of the evidence claims. Appellant's claims are without merit and no relief is due.

Statement of Facts

On July 16, 2020, Tyreese Parker robbed Appellant near the intersection of 11th Street and Loudon Street in Philadelphia, Pennsylvania. After the robbery, video footage showed

1

Appellant leave the area in a silver Chevrolet Equinox SUV, return, two (2) minutes later, in the same vehicle, fire multiple shots into a crowd of people, which included Mr. Parker, standing at the intersection, and then depart the scene, driving west on Loudon Street. Syheeb Sharpe, who was amongst the crowd, was struck by one of the rounds fired by Appellant and died from his injuries shortly thereafter. The Philadelphia Police Department initiated an investigation into the murder of Mr. Sharpe and placed Appellant's vehicle in felony "Want" status in the National Crime Information Center (NCIC) database, as a matter of interest in the investigation.

On August 7, 2020, Pennsylvania State Police Sergeant Thomas Hornung pulled Appellant over in Ashland, Pennsylvania as part of a routine traffic stop. During the stop, Sergeant Hornung discovered that Appellant's vehicle was in felony "Want" status, and seized the vehicle on behalf of the Philadelphia Police Department. While preparing to tow Appellant's silver Chevrolet Equinox, State Troopers observed a fired cartridge casing (FCC) lodged underneath the windshield wiper housing unit on the outside of Appellant's vehicle in plain view. Forensic testing later revealed that the FCC from Appellant's vehicle and FCCs from the scene of Mr. Sharpe's murder were all of the same caliber and were fired from the same firearm.

Appellant was subsequently arrested and charged with Murder,[1] Attempted Murder,[2] Possessing Instruments of Crime (PIC),[3] and two (2) violations of the Uniform Firearms Act: Firearms Not To Be Carried Without a License (VUFA § 6106),[4] and Carrying Firearms on Public Streets or Public Property in Philadelphia (VUFA § 6108).[5] At trial, the Commonwealth

---

[1] 18 Pa.C.S.A. § 2502.
[2] 18 Pa.C.S.A. § 901.
[3] 18 Pa.C.S.A. § 907(a).
[4] 18 Pa.C.S.A. § 6106(a)(1).
[5] 18 Pa.C.S.A. § 6108.

2

presented ten (10) witnesses as part of its case-in-chief against Appellant: Philadelphia Police Officers Walter Wyatt and Robert Flade, Philadelphia Police Detectives Thorsten Lucke, Lawrence Flagler, and Frank Mullen, Pennsylvania State Sergeants Alain Hunt and Thomas Hornung, Pennsylvania State Police Trooper Andrew Letcavage, Dr. Victoria Sorokin, and Tyreese Parker. The trial evidence and testimony presented at trial are summarized below.

Philadelphia Police Officer Walter Wyatt testified that he was on duty patrolling the 35th district in Philadelphia on July 16, 2020 when, at 12:05 a.m., he received a priority radio assignment for a report of a shooting incident. Officer Wyatt explained that he arrived at the intersection of 11th and Loudon Street and observed the victim, Syheeb Sharpe, receiving medical attention from a nearby fire station unit for a gunshot wound to his left hip. Officer Wyatt further testified that he followed the unit, as they transported and continued treatment of Mr. Sharpe, to Albert Einstein Medical Center where Mr. Sharpe was later pronounced dead at 12:38 a.m. Officer Wyatt stated that, after the incident, he prepared a 75-48 incident report, noting the dark-colored vehicle last seen travelling westbound on Loudon Street from the site of the shooting. *Id.* at 55-58.

Doctor Victoria Sorokin, an expert in forensic pathology who performed the autopsy of Mr. Sharpe, testified that the cause of Mr. Sharpe's death was a gunshot wound to his lower back and the manner of his death was a homicide. During her autopsy of Mr. Sharpe, Dr. Sorokin noted a wound to the lumbar region of Mr. Sharpe's back where the bullet entered, traveled through the musculature of Mr. Sharpe's back, hit the bone, and fragmented. Dr. Sorokin stated that the shattered bullet fragments then continued to travel through Mr. Sharpe's body, causing critical internal injuries and resulting in Mr. Sharpe's death. Dr. Sorokin further opined that, based on the location of the entrance wound and the trajectory of the bullet, Mr. Sharpe was

3

likely facing away from the shooter, his back facing the barrel of the gun. Additionally, Dr. Sorokin testified that Mr. Sharpe's toxicology report was negative for both alcohol and "drugs of abuse," and that each of her findings were to a reasonable degree of medical and scientific certainty. N.T. 5/3/23 at 167-180.

Philadelphia Police Sergeant Alaina Hunt, who was on patrol in the 35th District at the time of the shooting, testified that she responded to the scene of the crime after hearing gunshots and receiving a call over dispatch about a male shot on the highway at 11th and Loudon Street. Upon arrival, Sergeant Hunt secured the crime scene for the collection of evidence and any real-time camera footage of the scene. Sergeant Hunt then received information regarding a person of interest dressed in all white, who appeared to have a gun at his waist, from the real-time camera footage in the vicinity of the crime scene. Sergeant Hunt subsequently relayed this information to detectives and directed Officer Gallagher to prepare a crime scene log documenting the evidence and investigation. N.T. 5/2/2023, at 64-99.

Philadelphia Police Officer Robert Flade of the Crime Scene Unit (CSU) testified in lieu of the late Officer Lamont Fox, the original technician assigned to this case, regarding the evidence collected at the scene of the July 16, 2020 shooting. Officer Flade testified that the Crime Scene Unit took thirty-one (31) photos of the scene and retrieved seven (7) FCCs from the vicinity – five (5) from a USA .9mm Luger caliber firearm, and two (2) from a .40 Smith & Weston caliber firearm. While the five (5) .9mm FCCs were found scattered along the street in the vicinity of the 11th and Loudon Street intersection, the two (2) .40 S&W FCCs were located further west from the vicinity of the shooting. N.T. 5/3/2023 at 5-17.

Detective Frank Mullen, the lead investigator assigned to the case, testified that he arrived at the crime scene at 1:40 a.m., and observed a Philadelphia Police Department camera at

4

11th and Loudon Street. Detective Mullen explained that he spoke with Officer Brown of the Real-Time Crime Center, who reviewed the footage from the 11th and Loudon Street camera, and informed Detective Mullen of a person of interest seen on video wearing an all-white outfit with distinctive back pockets, carrying a handgun. Officer Brown further informed Detective Mullen that the individual was likely still in the vicinity of the crime scene and sent Detective Mullen a still image of the individual from the real-time footage. Detective Mullen subsequently approached an individual seated on a porch at 1113 West Loudon Street who matched Officer Brown's description and the still image, identified the individual as Tyreese Parker, and arranged to have Mr. Parker transported to homicide to give a statement. On Mr. Parker's person, Detective Mullen found only a bottle of Oxycodone pills prescribed to Appellant, listing Appellant's home address of 6118 Locust Street. N.T. 5/4/23 at 141-45, 147, 155-57.

The Commonwealth read into the record the preliminary hearing testimony of Tyreese Parker, who was unavailable at the time of Appellant's trial. At the preliminary hearing, Mr. Parker testified that he was "shooting dice" at the corner of 11th and Loudon Street in Philadelphia, on July 16, 2020. Mr. Parker further admitted to purchasing an "E pill" from an individual he described as "old head," and later getting into a physical altercation with this "old head" which resulted in Mr. Parker shoving him. *Id.* at 97-100. Mr. Parker testified that "old head" then got into his car, pulled off, and returned to the corner, where Mr. Parker claimed numerous people were present. Mr. Parker then recalled hearing gunshots and, subsequently, seeing Syheeb Sharpe lying on the ground. Finally, Mr. Parker recalled giving a statement to homicide detectives regarding the incident. N.T. 5/4/23, at 87, 96-103.

Detective Mullen subsequently recovered both the real-time footage as well as video footage from three (3) nearby stores in the surrounding area – a Q&R Market at the intersection

5

of Marvine and Loudon Street, a "Monty Market" at 6100 Locust Street, and a Boombox Deli at 11th and South Loudon Street. *Id.* at 139-140 & 160; N.T. 5/3/23 at 74, 82. Detective Thorsten Lucke, an expert in digital surveillance and video recovery analysis, testified to reviewing all the footage supplied by Detective Mullen. Detective Lucke noted that, at the 11:50 p.m. mark on July 15, 2020, the camera at the Boombox Deli showed an individual wearing a number eleven (11) Eagle's jersey and a baseball hat park a silver SUV at the corner of the street, exit the vehicle, walk into the view of the real-time pole camera, and engage in "gambling" and "dice game[s]" with Decedent and an individual dressed in all white with distinctive designs on his back pockets. N.T. 5/3/23 at 84-92.

Detective Lucke further testified to a physical altercation which the real-time camera captured at 12:03 a.m. on July 16, 2020. Detective Lucke observed the individual dressed in all white grabbing at the pocket area of the individual in the Eagle's jersey as the latter lay on the ground. The real-time camera then showed the individual in the Eagle's jersey, after receiving assistance from bystanders in the area, exit the scene in his silver Chevy SUV, heading East on Loudon from 11th Street, at 12:05 a.m. At 12:07 a.m., the Boombox Deli camera captured footage of the movements of the silver Chevy SUV circling the block and reapproaching the 11th and Loudon Street intersection. Detective Lucke testified to the occurrence of a shooting and observed the Decedent collapse on the corner, several bystanders in the vicinity run in the opposite direction of the cameras, and the SUV depart the scene at a high rate of speed, traveling west on Loudon Street with the driver-side window open. N.T. 5/3/23 at 100-107, 150-52.

Detective Mullen testified to reviewing the real-time video footage of the 11th and Loudon Street intersection himself and observing Mr. Parker – identifiable by his all-white outfit and the distinctive designs on the back pockets of his shorts – rob an individual wearing an

6

Eagle's t-shirt. Detective Mullen testified to seeing Mr. Parker throw this individual to the ground, remove an item from that individual's pocket, and place it in his own. Detective Mullen then observed the individual in the Eagles t-shirt exit the scene in a silver Chevy SUV and return minutes later in a "light-colored" SUV. Detective Mullen stated that the real-time camera panned away from the crime scene at the time of the shooting but noted that he did observe members of the crowd "scatter" after the shooting occurred. Using police databases and the torn prescription label on the pill bottle retrieved from Mr. Parker, Detective Mullen was able to generate a photo of Appellant which Detective Mullen used to confirm Appellant's identity as the individual from the real-time footage who was robbed by Mr. Parker. N.T. 5/4/23 at 152, 156-59.

Detective Mullen subsequently searched the surrounding area of Appellant's residence at 6118 Locust Street and inquired into any vehicles registered to Appellant. Thereafter, the Pennsylvania State police informed Detective Mullen of a silver 2007 Chevrolet Equinox registered in Appellant's name, which Detective Mullen entered in the Pennsylvania Criminal Information Computer (PCIC) and the National Criminal Information Computer (NCIC) databases as wanted in connection with a murder in Philadelphia. *Id.* at 163-165.

Pennsylvania State Police Sergeant Thomas Hornung testified that, on August 7th, 2020, while on patrol in Ashland, Pennsylvania, he witnessed a gray Chevrolet Equinox commit a Motor Vehicle Code violation. After stopping the vehicle and running its license plate through the NCIC database, Sergeant Hornung discovered that there was a warrant for the vehicle in connection to a homicide in Philadelphia. Sergeant Hornung subsequently called for backup and detained the driver, who Sergeant Hornburg described as wearing a "Carson Wentz" jersey, for an investigation of the vehicle. After pulling the driver from the vehicle and handcuffing him,

7

Sergeant Hornung explained to the driver that he was not under arrest and that his vehicle was in "wanted" status. N.T. 5/2/23 at 107-118.

Detective Lucke testified to reviewing the dash camera footage from the August 7, 2020 vehicle stop and identified the Chevrolet Equinox from the footage as the same Chevrolet SUV involved in the July 16, 2020 shooting. Detective Lucke further identified Appellant as the driver from the vehicle stop, noting that the Number 11 Eagles "Wentz" jersey, which the driver was wearing in reverse, was consistent with the Eagles jersey Appellant was wearing on the night of the shooting. N.T. 5/3/23 at 120-24.

Pennsylvania State Police Trooper Andrew Letcavage testified that he responded to Sergeant Hornburg's request for backup and assisted in both the traffic stop and the investigation of Appellant's vehicle. He testified that he performed the inspection of the vehicle's exterior and observed, in plain view, an FCC originating from a .9mm Lugar caliber firearm in the windshield wiper housing unit on the driver's side of the vehicle. Trooper Letcavage testified that he later photographed, recovered, and submitted these FCCs for forensic testing. Following the examination of Appellant's vehicle, Sergeant Hornburg arranged to have Appellant driven to his Ashland, Pennsylvania residence, and impounded Appellant's vehicle for retrieval by the Philadelphia Police Department. N.T. 5/2/23 at 138-141.

Detective Mullen testified to obtaining a search warrant for the vehicle, which was subsequently executed by Philadelphia Police Officer Robert Flade of the Crime Scene Unit. N.T. 5/4/23 at 167. In lieu of the late Officer Lamont Fox, the original technician assigned to this case, Officer Flade testified regarding the evidence collected at the scene of the July 16, 2020 shooting and the subsequent examination of Appellant's vehicle. Officer Flade testified that the Crime Scene Unit retrieved seven (7) FCCs from the vicinity of 11th and Loudon Street, five (5)

8

of which originated from a USA .9mm Luger caliber firearm and were found scattered along the street in the vicinity of the 11th and Loudon Street intersection. Officer Flade further testified to applying a filter to the exterior of Appellant's vehicle for subsequent analysis for gunshot residue. N.T. 5/3/2023 at 5-24.

Philadelphia Police Officer Lawrence Flagler, an expert in firearms identification and analysis, confirmed that the FCC recovered from the August 7, 2020 traffic stop belonged to a .9mm Luger caliber firearm. Officer Flagler testified that the 9mm Luger FCC that was recovered from Appellant's vehicle on August 7, 2020, and the five 9mm Luger FCCs that were recovered from the scene of the shooting all originated from the same firearm. *Id.* at 196- 210. Officer Flagler further testified that the bullet jacket recovered from Mr. Sharpe's body during his autopsy belonged to a .9mm caliber firearm, though he could not confirm from which specific weapon it originated. N.T. 5/04/2023 at 49.

Additionally, Officer Flagler explained that the placement of the five (5) 9mm FCCs from the July 16th shooting was consistent with some type of movement by the shooter. N.T. 5/3/23 at 217-218. Officer Flagler further explained that the ejection trajectory of an FCC from a .9mm caliber firearm is over the right shoulder of the shooter. Accordingly, Officer Flagler concluded that, were a shooter to fire a .9mm caliber firearm out of the driver's side front window of a vehicle, the FCCs could lodge in the various crevices in the windshield and car panels. Following the search of Appellant's vehicle and the discovery of the FCC, Detective Mullen issued an arrest warrant for Appellant which State Troopers executed at Appellant's home in Ashland, Pennsylvania. N.T. 5/04/2023 at 36-45, 171.

9

On July 25, 2022, prior to trial, Appellant filed a motion to suppress physical evidence, arguing that the seizure of Appellant's vehicle violated his rights under the U.S. and Pennsylvania Constitutions. This Court subsequently held a motion hearing on March 23, 2023, in which it heard testimony from Philadelphia Police Detective Frank Mullen and arguments from both the Commonwealth and Appellant's counsel. N.T. 3/23/23 at 11-84. On March 30, 2023, after reviewing the testimony, evidence, arguments, and case law, this Court denied Appellant's motion to suppress. N.T. 3/23/2023.

Appellant's jury trial commenced before this Court on May 2, 2023. On May 9, 2023, after hearing all evidence and closing arguments from counsel, a jury found Appellant guilty of Murder of the Third Degree, Attempted Murder, Possessing Instruments of Crime, and two (2) Violations of the Uniform Firearms Act – VUFA §6106 and VUFA §6108. This Court ordered a presentence investigation report and a mental health evaluation for Appellant and deferred sentencing to a later date. N.T. 5/9/2023, at 31-37.

This Court subsequently held a sentencing hearing for Appellant on August 21, 2023. At the hearing, this Court first noted that Appellant's presentence investigation report was incomplete. Appellant, however, waived his right to the completed report and permitted this Court to proceed with sentencing. After hearing several statements from Mr. Sharpe's family, and considering Appellant's mental health evaluation and prior record score, the sentencing guidelines, arguments from counsel, and the facts and circumstances of this case, this Court sentenced Appellant to an aggregate term of twenty-two (22) to forty-four (44) years of confinement. At the close of the hearing, Appellant's counsel advised Appellant of his rights on

appeal, Appellant requested the appointment of new counsel for his appeal, and this Court appointed James Lloyd, Esq. to serve as Appellant's appellate counsel. N.T. 8/21/23 at 4-42.

On August 31, 2023, Appellant, through newly appointed counsel, filed timely post-sentence motions raising weight of the evidence claims and requesting an arrest judgment, a vacation of Appellant's sentence, and a new trial. Appellant's Post-Sentence Motion 8/31/2023, at 1-3. Appellant's counsel further requested an extension of time to file supplemental post-sentence motions, which this Court granted on September 5, 2023. Appellant failed to file supplemental post-sentence motions, and, on January 8, 2024, Appellant's original post-sentence motions were denied by operation of law.

On February 7, 2024, Appellant's counsel, filed a timely notice of appeal from the judgement of sentence imposed on August 21, 2023. On February 8, 2024, this Court directed Appellant to file a 1925(b) Statement of Errors Complained of on Appeal, which Appellant, through counsel, subsequently filed on February 29, 2024. On April 24, 2024, James Lloyd Esq. filed a motion to withdraw as Appellant's counsel which this Court granted on June 3, 2024, appointing Gina A. Amoriello, Esq. to serve as counsel for the remainder of Appellant's direct appeal.

In his 1925(b) Statement of Errors Appellant, raises the following four (4) issues:

1. The trial court erred when it denied Appellant's pre-trial motion to suppress physical evidence recovered from his August 7, 2020, traffic stop because the evidence presented at the suppression hearing did not establish by a preponderance of the evidence that there was probable cause to seize and then search Appellant's vehicle.

2. The evidence was legally insufficient to support Appellant's convictions for Murder of the Third-Degree, Violation of Uniform Firearms Act §6106, Violation of Uniform Firearms Act §6108, and Possessing Instruments of Crime as the Commonwealth failed to prove their case beyond a reasonable doubt.

11

3. The verdict finding Appellant guilty of Murder of the Third Degree, Attempted Murder, Violation of Uniform Firearms Act §6106, and Violation of Uniform Firearms Act §6108 was against the weight of the evidence to such a degree as to shock one's conscience and sense of justice as the Commonwealth's case-in-chief was based upon circumstantial evidence.

4. The trial court erred and improperly admitted the preliminary hearing testimony of unavailable witness Tyreese Parker at Appellant's trial because his invocation of his right against self-incrimination was improper as he was granted immunity with respect to his testimony at trial.

Appellant's Pa.R.A.P. 1925(b) Statement of Matters.

## Discussion

### I. This Court did not err in denying Appellant's motion to suppress physical evidence because its factual findings were supported by the record.

Appellant's first claim was that this Court erred when it denied his Motion to Suppress Physical Evidence. Prior to trial, Appellant filed a Motion to Suppress Physical Evidence in relation to the fired cartridge casing that was recovered as part of a routine traffic stop on August 7, 2020. On March 23, 2023, a hearing was held on the matter and Appellant's counsel argued that there was no probable cause to prolong the traffic stop of Appellant's vehicle and the subsequent search resulting from the stop was an illegal warrantless search as Appellant argued that Philadelphia Police Detective Frank Mullen should have procured a warrant to place the vehicle in the NCIC database. Appellant maintained that their argument indicated the evidence recovered from the stop was fruit of the poisonous tree and therefore should have been suppressed.

The Commonwealth called Detective Mullen to the stand to testify to the investigation that took place to justify placing Appellant's vehicle in felony status in the NCIC database as part of their argument that Appellant's motion should be denied. The Commonwealth argued that

12

placing Appellant's vehicle in "Want" status was just an investigative step that was commonly used across every division of the Philadelphia Police Department. They maintained that putting a vehicle in Wanted status in the NCIC was the equivalent to putting a patrol alert out to police officers to be on the lookout for this vehicle in relation to a crime, placing it in the NCIC just essentially extends the patrol alert to outside of Philadelphia. N.T. 3/23/2023, p. 78. The result of an officer locating the vehicle while on patrol would typically be to impound the vehicle while detectives obtain a search warrant to allow them to investigate further. Additionally, the Commonwealth argued that the FCC was in plain view on the outside of Appellant's vehicle and therefore the plain view doctrine applies and allows the retrieval of said evidence. This Court denied Appellant's motion and maintained that it was a permissible search under the automobile exception and the plane view doctrine.

Appellant now argues that the evidence presented at the suppression hearing did not establish by a preponderance of the evidence that there was probable cause to seize and then search his vehicle. Appellant contends that his constitutional rights under the Fourth and Fourteenth Amendments of the United States Constitution and Article 1, §8 of the Pennsylvania Constitution were violated when the 9mm FCC was seized during the warrantless search of the outside of his vehicle. Appellant maintains that there was insufficient probable cause to justify the order to seize his vehicle by placing it in felony status in the NCIC database. Appellant argued that a lack of such probable cause meant the police had illegally prolonged his traffic stop without reasonable suspicion or probable cause. Appellant also contended that no exigent circumstances existed and that no exception to the warrant requirement, including the plain view doctrine, allowed for a warrantless search of the exterior of Appellant's vehicle. Appellant's Pa.R.A.P. 1925(b) Statement of Matters. Appellant's first claim is without any merit.

13

An appellate court's standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. *Commonwealth v. Jones*, 121 A.3d 524, 526 (Pa. Super. 2015). Where Appellant is appealing the ruling of the suppression court, the appellate court may only consider the evidence of the Commonwealth and so much of the evidence for Appellant as remains uncontradicted. The appellate court's scope of review of suppression rulings includes only the suppression hearing record and excludes evidence elicited at trial. *Commonwealth v. Chapman*, No. 1164 WDA 2023, 2024 WL 3580369, at *2 (Pa. Super. July 30, 2024). When the suppression court's factual findings are supported by the record, the appellate court is bound by those findings and may reverse only if the court's legal conclusions are erroneous. *Jones*, at 526. It is the "sole province of the suppression court to weigh the credibility of the witnesses" and the suppression court judge is "entitled to believe all, part or none of the evidence presented." *Commonwealth v. Caple*, 121 A.3d 511, 516-17 (Pa. Super. 2015).

The Fourth Amendment of the United States Constitution and Article I, § 8 of the Pennsylvania Constitution protect citizens against unreasonable searches and seizures. U.S. CONST. amend. IV; PA. CONST. Art. 1, § 8. The Pennsylvania Constitution provides broader protections than those of the United States Constitution in this regard and even protects an "individual's privacy interest in all of his or her possessions or things in any place they may be, which would include, by necessity, when they are located inside of an automobile." *Commonwealth v. Alexander*, 243 A.3d 177, 202-203 (Pa. 2020).

Our Courts have long recognized that interactions between law enforcement and the public fall within three categories: mere encounters, investigative detentions, and custodial

14

detentions. *Commonwealth v. Adams*, 205 A.3d 1195, 1199-1200 (Pa. 2019). First, a "mere encounter" (or request for information) need not be supported by any level of suspicion, but it also carries no official compulsion to stop or to respond. Second, an "investigative detention" must be supported by a reasonable suspicion; it subjects a suspect to a stop and a period of detention but does not involve such coercive conditions as to constitute the functional equivalent of an arrest. Third, there's an arrest or "custodial detention" which must be supported by probable cause. *Commonwealth v. Stilo*, 138 A.3d 33, 36 (Pa. Super. 2016).

The standard of probable cause is made out when the facts and circumstances are "sufficient to warrant a man of reasonable caution in the belief that the suspect has committed or is committing a crime." *Commonwealth v. Thompson*, 985 A.2d 928, 931 (Pa. 2009). Comparatively, the standard of reasonable suspicion that is necessary for an investigative detention is less stringent than that of probable cause. To determine whether a police officer had reasonable suspicion, the totality of the circumstances known to the officer at the time of the investigative detention must be considered. *Stilo*, at 36. Police are generally required to obtain a warrant supported by probable cause and issued by a neutral, detached magistrate to search a place where a person has a reasonable expectation of privacy. *Commonwealth v. Barr*, 266 A.3d 25, 39-40 (Pa. 2021).

A search conducted without a warrant is "deemed to be unreasonable and therefore constitutionally impermissible, unless an established exception applies." *Commonwealth v. Strickler*, 757 A.2d 884, 888 (Pa. 2000). One exception to the warrant requirement is the automobile exception. *Commonwealth v. Dunnavant*, 63 A.3d 1252, 1257 n.3 (Pa. Super. 2013). Police may lawfully stop an automobile if they have probable cause to believe that a violation of the Motor Vehicle Code is occurring or has occurred. 75 Pa.C.S.A. § 6308; *Commonwealth v.*

15

*Arrington*, 233 A.3d 910 (Pa. Super. Ct. 2020). Within Pennsylvania, however, warrantless vehicle searches require probable cause and exigent circumstances "beyond mere mobility." *Commonwealth v. Burgos*, No. 872 MDA 2013, 2014 WL 10986737, at *4 (Pa. Super. Feb. 7, 2014).

At a traffic stop, the Superior Court of Pennsylvania has recently reiterated that "[a]n officer may prolong a traffic stop if, before completing the purpose of the stop, the officer develops additional suspicion. Further reasonable suspicion can support continued investigation...." *Commonwealth v. Garcia*, 311 A.3d 1138, 1146 (Pa. Super. 2024) (citations omitted). It has also been observed that, "[a]n investigative detention may last as is necessary to confirm or dispel such suspicion." *Commonwealth v. Cauley*, 10 A.3d 321, 326 (Pa. Super. 2010). Additionally, it has found that a report from the National Crime Information Center ("NCIC") is sufficient to form reasonable and articulable grounds, i.e., probable cause, that a crime is being committed or has been committed. *Commonwealth v. Bolton*, 831 A.2d 734, 736 (Pa. Super. 2003).

Another exception to the warrant requirement is the plain view doctrine, which provides that "evidence in plain view of the police can be seized without a warrant." *Commonwealth v. Luczki*, A.3d 530, 546 (Pa. Super. 2019). The plain view doctrine "permits the warrantless seizure of an object when: (1) an officer views the object from a lawful vantage point; (2) it is immediately apparent to him that the object is incriminating; and (3) the officer has a lawful right of access to the object." *Commonwealth v. Heidelberg*, 267 A.3d 492, 504 (Pa. Super. 2021) (quoting *Commonwealth v. Bumbarger*, 231 A.3d 10, 19 (Pa. Super. 2020)). A court must look to the totality of the circumstances when judging whether the incriminating nature of an object was immediately apparent to the police officer. *Id.* In viewing the totality of the circumstances, "the

16

officer's training and experience should also be considered." *Id.* When considering the officer's lawful right to access the object, where police officers observe incriminating-looking contraband in plain view in a vehicle from a lawful vantage-point, the lack of advance notice and opportunity to obtain a warrant provides the officers with a lawful right of access to seize the object in question." *Id.*

Appellant's first claim is without merit. Appellant claims that this Court erred in denying his pre-trial motion to suppress evidence because he believed the evidence presented at the suppression hearing did not establish by a preponderance of the evidence that there was probable cause to prolong the traffic stop to seize and search Appellant's vehicle. However, the record supports this Court's findings. First, this Court found that the record indicated that Sergeant Hornung had sufficient additional suspicion to prolong the stop. It has been established by the Court in *Garcia* that an officer can prolong a stop if they receive additional suspicion prior to finishing the original purpose of their stop. Since the NCIC report that Appellant's vehicle was wanted in connection to a homicide in Philadelphia was received prior to the end of the original purpose of his stop, Sergeant Hornung had the requisite additional suspicion required to prolong the traffic stop.

Appellant also argues that the search of his vehicle during the traffic stop was an illegal warrantless search, but this Court found the record to indicate otherwise. This Court maintains that the warrantless search of the outside of Appellant's vehicle was a permissible search under the plain view doctrine. The testimony and video footage shown to this Court provided sufficient proof to conclude that the search met all three elements necessary to invoke the plain view doctrine. First, State Trooper Letcavage, who performed the search, was able to view the 9mm FCC from a lawful vantage-point as the FCC was visible even underneath the windshield wiper

17

outside of the vehicle. Second, given that it was an FCC from a bullet and the fact that the vehicle was a matter of interest in a homicide investigation, it was immediately apparent to State Trooper Letcavage that the object was incriminating. Third, State Trooper Letcavage had a lawful right to access the object. Given that this situation developed from a routine traffic stop and the search was a cursory inspection of the vehicle's exterior for damage before towing, there was a lack of advance notice and no opportunity to obtain a warrant. Therefore, the circumstances provided Trooper Letcavage with a lawful right of access to seize the object in question.

Appellant further contends that Detective Mullen had insufficient evidence to establish probable cause to order the seizure of his vehicle. This Court found that the facts were sufficient to support the finding that probable cause existed for Detective Mullen to order the seizure of Appellant's vehicle. This Court's conclusion was supported by the record of Detective Mullen's testimony regarding the investigation and the other evidence provided by the Commonwealth. Video footage showed an individual who, after getting robbed, was seen driving away in a silver-colored Chevrolet SUV before shortly returning to the scene. The individual's vehicle approached the corner where the man who robbed him was clearly located and then the shooting transpired. The conclusion that the shooting occurred at this moment was supported by the video footage as people could be seen desperately running away from the direction of where the vehicle was positioned to seek cover, and it did not end until after the vehicle was seen speeding away on the video. Detective Mullen observed this and concluded that the victim of the robbery was someone of interest to the investigation since the shooting coincided with the vehicle's reappearance. He was then able to locate the person seen robbing the individual and identified him as Tyreese Parker.

18

After identifying Mr. Parker, an investigation into him led Detective Mullen to find a pill bottle in Mr. Parker's possession that he took from the victim of the robbery. A search into the DEA number on the pill bottle yielded the information that the prescription belonged to Appellant and provided a Philadelphia address for him. From this information, Detective Mullen procured a photo of Appellant and searched DMV records to discover any vehicles that were in Appellant's name. Cross-comparing Appellant's appearance as well as his current vehicle, a 2007 silver Chevrolet Equinox SUV, to the video footage, Detective Mullen determined that Appellant and his vehicle were a match for who he was seeing in the video footage. Subsequently, Detective Mullen concluded that locating Appellant's vehicle was necessary to continue the investigation. These facts formed the basis for this Court's factual finding that there was probable cause for Detective Mullen to order the seizure of Appellant's vehicle at the traffic stop.

Despite Appellant's contentions to the contrary, this Court's factual findings are supported by the record and no legal error exists. The Commonwealth's evidence and testimony presented was sufficient for this Court to decide that this was a permissible search under the plain view doctrine, the NCIC report was sufficient for Sergeant Hornung to prolong Appellant's traffic stop, and there was probable cause that permitted the seizure of Appellant's vehicle. As such, Appellant's first claim is without merit as this Court did not err in denying Appellant's pre-trial motion to suppress physical evidence.

II. **There was sufficient evidence for a jury to convict Appellant of Murder of the Third Degree, Possessing an Instrument of Crime, Violation of Uniform Firearms Act §6106, and Violation of Uniform Firearms Act §6108.**

Appellant's second claim was that the evidence presented was insufficient to support the jury's verdict finding Appellant guilty of Murder of the Third Degree, Possessing an Instrument

19

of Crime, Violation of Uniform Firearms Act §6106, and Violation of Uniform Firearms Act §6108. Appellant contends that the Commonwealth failed to prove beyond a reasonable doubt that he was the person who shot Mr. Sharpe.

In reviewing a challenge of the sufficiency of the evidence, the standard of review is to, "determine whether the evidence admitted at trial and all reasonable inferences therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, were sufficient to prove every element of the offense beyond a reasonable doubt." *Commonwealth v. Palmer*, 192 A.3d 85, 89 (Pa. Super. 2018). The Commonwealth "need not establish guilt to a mathematical certainty," meaning any doubt about a defendant's guilt "is to be resolved by the fact finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances." *Commonwealth v. Sebolka*, 205 A.3d 329, 336-337 (Pa. Super. 2019). This standard is equally applicable to cases where the evidence is circumstantial rather than direct "so long as the combination of the evidence links the accused to the crime beyond a reasonable doubt." *Commonwealth v. Swerdlow*, 636 A.2d 1173, 1176 (Pa. Super. 1994). The Commonwealth may sustain its burden by means of wholly circumstantial evidence. *Commonwealth v. Montalvo*, 956 A.2d 926, 932 (Pa. 2008) (citing *Commonwealth v. Diggs*, 949 A.2d 873, 977 (Pa. 2008)). It is "within the province of the fact-finder to determine the weight to be accorded to each witness's testimony and to believe all, part, or none of the evidence." *Palmer*, 192 A.3d at 89.

As will be further explained below, this Court concluded that when viewing the evidence in the light most favorable to the Commonwealth as verdict winner, there was sufficient evidence for a jury to convict Appellant of Murder of the Third Degree, Possessing an Instrument of Crime, Violation of Uniform Firearms Act §6106, and Violation of Uniform Firearms Act

§6108. Appellant's challenge to the sufficiency of the evidence for his conviction is without merit, and accordingly, no relief is due.

    a.   <u>The Commonwealth presented ample evidence sufficient to establish that Appellant was guilty of Murder of the Third Degree beyond a reasonable doubt.</u>

Appellant first argues that there was no legally sufficient evidence presented by the Commonwealth which established that he was guilty of Murder of the Third Degree beyond a reasonable doubt. Murder of the Third Degree is statutorily defined as "all other kinds of murder" other than Murder of the First Degree and Murder of the Second Degree. 18 Pa.C.S.A. § 2502(c). In effect, to convict a defendant of Murder of the Third Degree, the Commonwealth need only prove beyond a reasonable doubt that defendant killed an individual with malice. *Commonwealth v. Jones*, 271 A.3d 452, 458 (Pa. Super. 2021). Malice is defined as "exhibiting an extreme indifference to life." *Commonwealth v. Ludwig*, 874 A.2d 623, 632 (Pa. 2005) (quoting *Commonwealth v. Young*, 431 A.2d 230, 232 (Pa. 1981)). Malice includes "not only particular ill will toward the victim, but also wickedness of disposition, hardness of heart, wantonness and cruelty, recklessness of consequences, and conscious disregard by the defendant of an unjustified and extremely high risk that his actions may cause serious bodily harm." *Id*. The mental state of malice thus exceeds that of "ordinary recklessness." *Commonwealth v. Packer*, 168 A.3d 161, 169 (Pa. 2017). The "quintessential example of the level of recklessness required to constitute malice is a defendant who shoots a gun into a crowd." *Id*.

The Commonwealth presented ample sufficient evidence to convict Appellant of each element of Murder of the Third Degree beyond a reasonable doubt. The record reflects that sufficient evidence was presented to show that Appellant killed Mr. Sharpe with the requisite malice. The evidence first established that Mr. Sharpe was killed. Officer Wyatt first testified

21

that Mr. Sharpe was rushed to Albert Einstein Medical Center at 5500 Old York Road, Philadelphia, PA 19141 and that was where Mr. Sharpe was pronounced dead by Doctor Sadiq at 12:38 a.m., on July 16, 2020. Additionally, Dr. Victoria Sorokin testified that her autopsy of Mr. Sharpe led to her conclusion that Mr. Sharpe's cause of death was homicide as a result of being shot. She explained that the bullet that struck him from behind had entered through his lower back before hitting bone and shattering into shrapnel. That shrapnel then spread through Mr. Sharpe's body, causing internal damage which resulted in his death. N.T.5/3/2023, at 170-177.

The record also reflects sufficient evidence existed to implicate Appellant as the individual who had killed Mr. Sharpe. Appellant was connected to the scene by multiple pieces of evidence. First, Appellant's presence on the scene was established by the video footage that Detective Lucke examined and compared between the night of Mr. Sharpe's murder on July 16, 2020, and the night of Appellant's traffic stop on August 7, 2020. The silver Chevrolet SUV seen at the murder matched Appellant's silver Chevrolet Equinox SUV that he was pulled over in by State Troopers in Ashland, Pa on August 7, 2020. Appellant himself was a match for the individual seen on the July 16, 2020 video footage and he was even wearing the same clothes, a number eleven Eagles jersey, for the murder and for the traffic stop. *Id*. at 121-122. Detective Lucke also showed that Appellant's window was down when he was turning the corner, making it possible for him to fire into the crowd as he drove by.

Second, Appellant was connected to the scene through a pill bottle Mr. Parker possessed when Detective Mullen had him brought in for questioning. The investigation led Detective Mullen to conclude that the robbery was when Mr. Parker took possession of the pill bottle, and that Mr. Parker's robbery victim was a person of interest in the investigation. This was evidenced by the fact that the robbery victim was driving the car which subsequently returned to the scene

22

for the shooting. So, when a search into the DEA number from the bottle yielded an Oxycodone prescription in Appellant's name, it presented him with the identity of the individual who he believed was involved in the shooting. Detective Mullen reasoned that Appellant, as the robbery victim, was involved with the shooting since the video footage clearly showed that Appellant, after getting robbed, got in his silver Chevrolet Equinox to drive away, only to return to the corner. Only once Appellant arrives back at the corner does the shooting start. So, Mr. Parker, having Appellant's pill bottle in his possession, tied Appellant to the scene. N.T. 5/3/2023, at 152-156.

While no firearm was recovered in this case, Officer Lawrence Flagler was able to testify to the abundant ballistic evidence still available that tied Appellant to the scene as well. His testimony revealed that the five 9mm Luger FCCs that were retrieved from the scene of the shooting, and the single 9mm Luger FCC that was recovered from Appellant's vehicle at the traffic stop were fired from the same firearm. Evidence also revealed that the bullet that struck Mr. Sharpe was a 9mm round, the same caliber as the FCCs that connected Appellant and his vehicle to the scene. *Id.* at 196- 210; N.T. 5/4/2023, at 4. This evidence together, was sufficient to establish that Appellant was the individual shooting that night and his 9mm bullet was the one that killed Mr. Sharpe.

Additionally, the record also reflects sufficient evidence existed to prove that Appellant killed Mr. Sharpe with malice. Evidence and the facts of the case established that Appellant had malice when he shot Mr. Sharpe on July 16, 2020. While Appellant may not have had ill-will or the intent to specifically murder Mr. Sharpe, Appellant still acted with malice when he fired indiscriminately and recklessly into a crowd. As stated by the Court in *Packer*, the quintessential

23

example of the level of recklessness required to constitute malice is a defendant who shoots a gun into a crowd, which is precisely what occurred here. *Packer*, 168 A.3d at 169.

This Court thus concludes that the Commonwealth introduced sufficient evidence to support each element of Appellant's conviction for Murder of the Third Degree. Viewed in the light most favorable to the Commonwealth as verdict winner, the foregoing evidence was sufficient to establish that Appellant killed Mr. Sharpe with malice. The evidence established that Appellant was present at the scene of the crime – the corner of 11th Street and Loudon Street in Philadelphia, PA- at the date and time at which Mr. Sharpe was shot and killed. Finally, the evidence showed that Appellant acted with the requisite malice as he indiscriminately and recklessly fired into a crowd to retaliate against Mr. Parker. Appellant's challenge to the sufficiency of the evidence regarding his Murder of the Third-Degree conviction is therefore without merit and no relief is due.

b. The Commonwealth presented ample evidence sufficient to establish that Appellant was guilty of Possessing an Instrument of Crime, Violation of Uniform Firearms Act §6106, and Violation of Uniform Firearms Act §6108 beyond a reasonable doubt.

Appellant argues that there was no legally sufficient evidence presented by the Commonwealth which established that he was guilty of Possessing an Instrument of Crime, Violation of Uniform Firearms Act §6106, and Violation of Uniform Firearms Act §6108. The term "firearm" is defined in 18 Pa.C.S.A §6102 as "[a]ny pistol or revolver with a barrel less than 15 inches…or any pistol, revolver, rifle or shotgun with an overall length of less than 26 inches." A person violates 18 Pa.C.S.A. §6106 of the Uniform Firearms Act if he "carries a firearm concealed on or about his person…without a valid and lawfully issued license." A person violates 18 Pa.C.S.A. §6108 of the Uniform Firearms Act if he carries a "firearm, rifle, or shotgun at any time upon the public streets or upon any public property" in Philadelphia, unless

24

he is licensed to do so or exempt from licensing. Both statutes thus require an element of possession, which "can be found by proving actual possession, constructive possession, or joint constructive possession." *Commonwealth v. Heidler*, 741 A.2d 213, 215 (Pa. Super. 1999). Finally, a person commits the offense of Possession an Instrument of Crime ("PIC") if "he possesses any instrument of crime with intent to employ it criminally." 18 Pa.C.S.A. §907(a). An "instrument of crime" is defined as "[a]nything used for criminal purposes and possessed by the actor under circumstances not manifestly appropriate for lawful uses it may have." 18 Pa.C.S.A. §907(d)(2).

Constructive possession is an inference arising from a set of facts that possession of the gun was more likely than not and may be established by the totality of the circumstances. *Commonwealth v. Hopkins*, 67 A.3d 817, 820 (Pa. Super. 2013) (quoting *Commonwealth v. Brown*, 48 A.3d 426, 430 (Pa. Super. 2012)). A defendant must have "conscious dominion" over an object in order to constructively possess it. "Conscious dominion" is "the power to control the contraband and the intent to exercise that control." *Hopkins*, 67 A.3d at 820. "Mere presence or proximity to the contraband is not enough to prove constructive possession." *Commonwealth v. Peters*, 218 A.3d 1206, 1209 (Pa. 2019). Rather, "[t]he evidence must show a nexus between the accused the item sufficient to infer that the accused had the power and intent to exercise dominion and control over it." *Id*. The intent to exercise dominion and control over contraband in turn requires proof that the defendant had knowledge of the existence and location of the contraband. *Commonwealth v. Parrish*, 191 A.3d 31, 37 (Pa. Super. 2018).

The Commonwealth presented sufficient evidence to establish beyond a reasonable doubt that Appellant constructively possessed a firearm. Tyreese Parker testified to fighting with Appellant prior to Appellant departing in their silver vehicle. Mr. Parker then admitted that he

25

witnessed Appellant return to the intersection of 11th Street and Loudon Street immediately before hearing gunshots. Appellant was also caught on video driving from the scene in his silver Chevrolet Equinox. Detective Mullen testified that they recovered five (5) 9mm FCCs from the street at the scene and an additional 9mm FCC from Appellant's vehicle during the traffic stop on August 7, 2020. Officer Flagler explained in his testimony that these FCCs were analyzed and concluded that the FCC from the traffic stop and the FCCs from the scene originated from the same firearm and were consistent with originating from a 9mm firearm. Thus, leading to the conclusion that they were all fired from the same firearm. N.T. 5/3/2023, at 82-107, 121-122, 196- 210; N.T. 5/4/2023, at 4.

Mr. Sharpe was murdered by a USA 9mm Luger round, which constitutes a projectile fired from a firearm within the definition of 18 Pa.C.S.A. §6102. While a firearm was never recovered, video footage shows Appellant's silver Chevrolet Equinox arrive back at the scene prior to the shooting, be located where the shooting was determined to originate from and flee the scene immediately after the shooting. Moreover, the 9mm FCCs at the scene and the one found on Appellant's windshield wiper unit were fired from the same firearm and they matched the same caliber as the bullet jacket recovered in Mr. Sharpe's autopsy. Accordingly, the totality of the circumstances established that, at a minimum, Appellant constructively possessed a firearm in that he had conscious dominion over the firearm that was used to shoot and kill Mr. Sharpe. Further, this evidence was not only sufficient to establish that Appellant constructively possessed a 9mm firearm, but it was also sufficient to establish that he had possessed the gun for a criminal purpose, used it to commit a crime, and possessed it under circumstances not appropriate for its lawful use.

26

Therefore, the evidence, viewed in the light most favorable to the Commonwealth as verdict winner, established that Appellant constructively possessed a 9mm firearm for a criminal purpose and used it to commit a crime when he shot and killed Mr. Sharpe on 11th Street and Loudon Street, which are public streets in Philadelphia, PA. Additionally, Commonwealth entered into evidence a sealed and signed business record certifying that Appellant did not have a valid license to carry a firearm at the time of the shooting. N.T. 08/21/2023, at 13. Accordingly, the record therefore contained sufficient evidence to convict Appellant of both VUFA §6101, VUFA §6108, and PIC.

**III.** **The verdict finding Appellant guilty of Murder of the Third Degree, Attempted Murder, Possessing an Instrument of Crime, Violation of Uniform Firearms Act §6106, and Violation of Uniform Firearms Act §6108, was not against the weight of the evidence.**

Appellant's third claim was that the verdict finding him guilty of Murder of the Third Degree, Attempted Murder, Possessing an Instrument of Crime, Violation of Uniform Firearms Act §6106, and Violation of Uniform Firearms Act §6108, was against the weight of the evidence. Appellant contends that the weight of the evidence did not establish that he was the shooter who killed Mr. Sharpe, let alone that he possessed a firearm. He maintained that there were no witnesses who identified him; the murder weapon was never recovered; and the Commonwealth's case was based on circumstantial evidence. Appellant's challenge to the weight of the evidence is without merit and no relief is due.

Pennsylvania law regarding appellate review of weight of the evidence claims is well settled. A claim that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. *Commonwealth v. Widmer*, 744 A.2d 745, 751-752 (Pa. 2000). A true weight of the evidence challenge "concedes that sufficient evidence exists to sustain the

27

verdict but questions which evidence is to be believed." *Commonwealth v. Thompson*, 106 A.3d 742, 758 (Pa. Super. 2014). A new trial "should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion." *Widmer*, 744 A.2d at 752. In determining if the verdict is against the weight of the evidence, the trial court does not "sit as the thirteenth juror" but instead must find that "notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice." *Commonwealth v. Clay*, 64 A.3d 1049, 1055 (2013) (quoting *Widmer*, 744 A.2d at 752).

When seeking to determine the credibility of the witnesses, the finder of fact is "free to believe all, none, or some of the evidence and to determine the credibility of the witnesses." *Commonwealth v. Clemens*, 242 A.3d 659, 667 (Pa. Super. 2020). Reversal of a trial court verdict should therefore only be granted where the evidence is so "tenuous, vague and uncertain that the verdict shocks the conscience of the court." *Commonwealth v. Akhmedov*, 216 A.3d 307, 326 (Pa. Super. 2019). A jury's verdict "shocks the judicial conscience" when it "causes the trial judge to lose his breath, temporarily, and causes him to almost fall from the bench." *Id.* (quoting *Commonwealth v. Davidson*, 860 A.2d 575, 581 (Pa. Super. 2004)).

As the finder of fact in Appellant's case, it was the function of the jury to evaluate the evidence and determine the weight it should be given. The jury weighed the testimony and evidence presented by the Commonwealth's ten (10) witnesses in such a manner as to find Appellant guilty of one (1) count of Murder of the Third Degree, one (1) count of Attempted Murder, one (1) count of Possessing an Instrument of Crime (PIC), one (1) count of Firearms Not To Be Carried Without a License (VUFA§6106), and one (1) count of Carrying Firearms on Public Streets or Public Property in Philadelphia (VUFA §6108). Appellant subsequently filed a

28

post-sentence motion arguing that the jury's verdict was against the weight of the evidence. After a review of the testimony and evidence presented at trial, this Court denied Appellant's post-sentence motion without holding a hearing. In denying Appellant's post-sentence motion, this Court properly concluded that the jury's verdict did not shock the judicial conscience and was adequately supported by the weight of the evidence.

As this Court previously explained, and as Appellant concedes in challenging the weight of the evidence, there was sufficient evidence for the jury to convict Appellant of Murder of the Third Degree, Attempted Murder, PIC, VUFA§6106, and VUFA §6108. The evidence presented by the ten (10) witnesses at Appellant's trial led the jury to reasonably infer that Appellant engaged in the intentional shooting that caused the death of Mr. Sharpe. Appellant's contentions in support of his challenges do not outweigh the evidence supporting Appellant's convictions.

As testified by several of the Commonwealth's witnesses, including Detective Mullen, a shooting occurred on the corner of 11th Street and Loudon Street on July 16, 2020. Prior to the shooting, the Appellant was involved in a physical altercation with Mr. Parker, where he was robbed of his Oxycodone prescription. After the altercation, video footage showed Appellant return to his silver Chevrolet Equinox, drive around the block, and return to the corner. Appellant then fired his weapon into a crowd of people striking and killing Mr. Sharpe. Video footage showed Appellant fleeing from the scene right from where the shots were fired from. N.T. 5/3/2023 at 82-107.

Appellant argued that Mr. Parker, who Appellant claims was the Commonwealth's star witness, was a polluted source and the jury gave improper weight to his testimony. Most notably, Appellant argued that Mr. Parker identified him and accused Appellant of being the shooter to save himself. However, Appellant's argument was incorrect, and the record does not support

29

such claims. First, Appellant misstates the record as Mr. Parker never expressly identifies him. While Mr. Parker was useful to the investigation, his sole worth was not due to statements that were part of his testimony. What made Mr. Parker valuable was that he was found physically possessing evidence that connected Appellant to the crime scene. Detective Mullen testified to the fact that the video footage led them to Mr. Parker and ultimately revealed the pill bottle in his possession. Mr. Parker never once in his testimony identified Appellant or said that it was Appellant who had committed the shooting. The record showed that Mr. Parker reluctantly admitted to the fact that he had an altercation with who he calls an "old head" that he was buying drugs from, but he never identified that "old head" as Appellant. Rather, it was the pill bottle detectives confiscated from him that showed Appellant was his robbery victim, thereby placing Appellant at the scene, that truly yielded value for the Commonwealth from Mr. Parker. N.T. 5/4/2023, at 152-159.

Regardless of any potential inconsistencies in Mr. Parker's testimony, the jury, as fact finder, was free to choose what to believe and what not to believe from the testimony given. Further, whatever of Mr. Parker's testimony the jury gave weight to in their deliberations was corroborated by other pieces of evidence presented at Appellant's trial because the jury's verdict did not shock this Court's conscience. It was Philadelphia Police Detective Thorsten Lucke that testified that Appellant appeared to be present at the scene wearing a Philadelphia Eagles jersey, Mr. Parker did not name Appellant. N.T. 5/3/2023, at 82-107, 121-122. It was Detective Mullen who testified that it was Mr. Parker robbing Appellant, thereby corroborating the link between the two individuals established by the pill bottle in Mr. Parker's possession that belonged to Appellant, Mr. Parker did not admit to robbing Appellant. N.T. 5/4/2023, at 157-158. It was Philadelphia Police Officer Lawrence Flagler that testified regarding the 9mm FCCs at the scene

matching the 9mm FCC found on Appellant's vehicle a month later and their connection to the bullet jacket that was part of the round that killed Mr. Sharpe. N.T. 5/3/2023, at 196- 210; N.T. 5/4/2023, at 4. In weighing all the evidence presented at trial, the jury, and this Court upon its review, established that Appellant was at the scene of the crime and shot Mr. Sharpe. The jury, as factfinder, was able to determine the weight to be accorded to each witness's testimony and believe all, part, or none of the evidence.

Accordingly, the Commonwealth presented compelling testimony and evidence supporting Appellant's guilt. The testimony and evidence presented at trial was thus not so "tenuous, vague and uncertain" such that the jury's verdict finding Appellant guilty shocked the conscience of this Court. Appellant's challenge to the weight of the evidence is therefore without merit and no relief is due.

## IV. This Court did not err and properly exercised its discretion in admitting the preliminary hearing testimony of Tyreese Parker at trial.

On May 4, 2023, Mr. Parker asserted his Fifth Amendment privilege thereby choosing not to testify as he was facing pending cases in both state and federal court. Appellant's counsel argued that this invocation was improper because Mr. Parker had been given immunity in relation to his pending cases in state court by the Commonwealth. Appellant maintained that this Court should compel Mr. Parker to testify as the immunity meant that Mr. Parker did not have sufficient cause to refuse to testify. However, this Court ruled that Mr. Parker's invocation was proper because while he did have immunity from the Commonwealth for his pending cases in state court, that immunity did not extend to Mr. Parker's cases in federal court. This Court stated that Mr. Parker could not be compelled to testify as the invocation of his Fifth Amendment

31

privilege was in fact proper. As a result, this Court declared Mr. Parker to be declared unavailable. N.T. 5/4/2023, at 66-70.

At the prospect of having Mr. Parker's preliminary hearing testimony read into the record at trial, Appellant's trial counsel argued that Appellant and his previous counsel did not have a full and fair opportunity to cross-examine the witness. Appellant's trial counsel argued that at the time of the preliminary hearing, the attorney of record did not have an opportunity to question the witness about gun crimes that Mr. Parker was later charged with following the preliminary hearing. Appellant argued that as a result, his former counsel was not afforded the opportunity to develop a full cross-examination on the questions of Mr. Parker's motive and bias. N.T. 5/4/2023, at 71-73.

In response, the Commonwealth cited the ninety-one (91) page transcript of the preliminary hearing that took place on March 29, 2021, as evidence that Appellant's former counsel had an opportunity to undertake an extensive examination. The Commonwealth argued that the future open cases were not relevant or dispositive to the issue in the case at bar. Additionally, the Commonwealth stated that all information available to it, including a video interview of Mr. Parker, was shared with Appellant at the time of the preliminary such that Appellant's former counsel had all vital impeachment evidence and therefore had a fair and full opportunity to cross-examine. N.T. 5/4/2023, at 74-75.

This Court first reviewed the notes of testimony from the preliminary hearing and noted the cross-examination by Appellant's former counsel on the matter of Mr. Parker's gun cases. This Court stated that Appellant's former counsel's extensive cross-examination was similar to what Appellant would have done at trial. Based on Mr. Parker's assertion of his Fifth Amendment Privilege and the notes of testimony proving that Appellant's counsel had a full and

32

fair opportunity to cross-examine Mr. Parker at Appellant's preliminary hearing, this Court held that Mr. Parker was unavailable and that the notes of testimony for Mr. Parker from Appellant's preliminary hearing could be used at Appellant's current trial. Id. at 75-76.

Appellant's fourth and final claim was that this Court erred when it admitted the preliminary hearing testimony of Tyreese Parker to be read into the record at trial. Appellant argued that it was improper to declare Mr. Parker unavailable because he was granted immunity with respect to his testimony at trial. Appellant further maintained that even if Mr. Parker was unavailable, his trial counsel did not have a full and fair opportunity to cross-examine the Commonwealth's key witness as they were excluded from attacking the witness' bias with respect to subsequent charges. Mr. Parker was declared unavailable as he elected to exercise his Fifth Amendment privilege not to testify. Additionally, Appellant's constitutional rights were not violated because he and his former counsel had a full and fair opportunity to cross-examine Mr. Parker. Therefore, Appellant's claim is without merit and no relief is due.

The "admission of evidence is solely within the discretion of the trial court, and a trial court's evidentiary rulings will be reversed on appeal only upon an abuse of that discretion." *Commonwealth v. Reid*, 99 A.3d 470, 493 (Pa. 2014). Pennsylvania Rule of Evidence 801 defines "hearsay" as "a statement that (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Pa. R.E. 801(c). Hearsay, generally, is not admissible at trial. Pa.R.E. 802. Pennsylvania Rule of Evidence 804, however, permits the introduction of former testimony if the declarant is unavailable as a witness, so long as the testimony "was given as a witness at a trial, hearing, or lawful deposition" and "is now offered against a party who had...an opportunity and similar motive to develop it by direct, cross-, or redirect examination." Pa.R.E. 804(1).

33

Additionally, admitting former testimony is "subject to constitutional restraints arising out of the constitutional right to confront one's accusers." *Commonwealth v. Grush*, 295 A.3d 247, 252 (Pa. Super. 2023). The Supreme Court of the United States has held that where testimonial statements are at issue, "the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 68 (2004). The Supreme Court of Pennsylvania has held that "an unavailable witness's prior recorded testimony from a preliminary hearing is admissible at trial and will not offend the right of confrontation, provided the defendant had counsel and a full opportunity to cross-examine that witness at the prior proceeding." *Commonwealth v. Bazemore*, 614 A.2d 684, 685 (Pa. 1992). Where the defense was denied access at the time of the preliminary hearing to vital impeachment evidence, "a full and fair opportunity to cross-examine the unavailable witness may be deemed to have been lacking at the preliminary hearing." *Commonwealth v. Cruz-Centeno*, 668 A.2d 536, 542-543 (Pa. Super. 1995). Such vital impeachment evidence is defined as prior inconsistent statements made by the unavailable witness, their criminal record, or other such evidence that the Commonwealth was aware of, but did not disclose to the defense at any time prior to the preliminary hearing cross-examination of the relevant witness. *Id.*

A witness who properly invokes their Fifth Amendment privilege is deemed to be unavailable. *Bazemore*, 614 A.2d at 685. However, to be deemed unavailable for the purpose of testifying, the court must first determine whether the witness' concern with self-incrimination is legitimate. *Id.* Fifth Amendment "privilege against self-incrimination is liberally construed" and is found to be legitimate where a "witness has reasonable cause to apprehend danger from answering questions put to him or her in a judicial proceeding." *Id.* A witness should not be placed on the stand solely for the purpose of having him exercise his privilege against self-

34

incrimination before the jury. "If it appears that a witness intends to claim the privilege as to essentially all questions, the court may, in its discretion, refuse to allow him to take the stand. Neither side has the right to benefit from any inferences the jury may draw simply from the witness' assertion of the privilege..." *Commonwealth v. Yabor*, 546 A.2d 67, 69-70 (Pa. Super. 1988). The trial court must decide for itself whether the privilege exists as it is for the court to state whether the witness' silence is justified. Unless the privilege clearly does not apply, the trial court should not require the witness to answer. *Commonwealth v. Treat*, 848 A.2d 147, 149 (Pa. Super. 2004).

Upon review of the record, this Court finds that it properly permitted the admission of Mr. Parker's preliminary hearing testimony at Appellant's trial under the former testimony exception to the rule against hearsay. Mr. Parker stood before this Court and exercised his Fifth Amendment privilege not to testify because of the charges he was facing in federal court. Given that the Commonwealth's immunity deal was inapplicable to the federal level, this Court found that Mr. Parker and his counsel's argument that the federal charges established a reasonable cause to apprehend danger from Mr. Parker's testimony was sufficient. This Court concluded that because any of what Mr. Parker testified to, should he have testified, could be used against him depending on how his testimony went and what he could have said, this Court was required to declare him unavailable. *Id.* at 70.

Regardless of availability, Appellant argues that Mr. Parker's preliminary testimony should not have been read into the record at trial because he did not have a full and fair opportunity to cross-examine Mr. Parker at the hearing. Appellant maintains that he did not have a full and fair opportunity to cross-examine Mr. Parker because he lacked vital impeachment evidence since Mr. Parker was charged with two separate criminal acts in federal court following

35

the preliminary hearing. However, information about Mr. Parker's subsequent charges was immaterial as they are not vital impeachment evidence as defined by the Court in *Cruz-Centeno*. As stated previously, vital impeachment evidence consists of information that the Commonwealth was aware of prior to the preliminary hearing, such as prior inconsistent statements or Mr. Parker's criminal record, that they did not disclose to Appellant. Charges that were brought against Mr. Parker in federal court after the preliminary hearing could never have been a part of a group of prior knowledge that the Commonwealth was obligated to disclose to Appellant's counsel prior to the preliminary hearing. Therefore, the charges fail to qualify as vital impeachment evidence.

The record shows that Appellant possessed all vital impeachment evidence prior to the preliminary hearing because Appellant's questions on cross-examination pertained to Mr. Parker's criminal record and the inconsistencies between his answers and the video recordings of his statements to detectives, as well as other pieces of vital impeachment evidence. N.T. 5/4/2023, at 105-155. As such, the record proves that Appellant had a full and fair opportunity to cross-examine Mr. Parker. Given that Mr. Parker's invocation of his Fifth Amendment privilege was proper, and Appellant's counsel had a full and fair opportunity to cross-examine him, Appellant's constitutional rights under the U.S. and Pennsylvania Constitutions were not violated by the use of Mr. Parker's preliminary hearing testimony at Appellant's trial.

Accordingly, this Court was correct in concluding that Mr. Parker properly invoked his Fifth Amendment privilege not to testify and declare him unavailable. Further, this Court did not err in ruling that Mr. Parker's preliminary hearing testimony was admissible at trial. This Court maintained that Appellant's counsel had a full and fair opportunity to cross-examine Mr. Parker extensively at the preliminary hearing which warranted the conclusion that the testimony was

admissible. Appellant's challenge to the admissibility of Mr. Parker's preliminary hearing testimony is therefore without merit and no relief is due.

## Conclusion

In summary, this Court has carefully reviewed the entire record and finds no harmful, prejudicial, or reversible error and nothing to justify the granting of Appellant's request for relief. For the reasons set forth above, the judgment of the trial court should be affirmed.

By the Court:

12/20/24
Date

HONORABLE CHARLES A. EHRLICH

37